Harvey and Rebecca RUMBAUGH, Individually and as Next Friends Acting on Behalf of Charles Rumbaugh, Plaintiffs-Appellants,

v.

Raymond K. PROCUNIER, Director, Texas Department of Corrections, Defendant-Appellee.

No. 83–1161.

United States Court of Appeals, Fifth Circuit.

Feb. 20, 1985.

Rehearing and Rehearing En Banc Denied March 21, 1985.

Will Gray, Carolyn Garcia, Houston, Tex., for Harvey and Rebecca Rumbaugh.

Jim Mattox, Atty. Gen., Leslie A. Benitez, Asst. Atty. Gen., Duane E. Crowley, Austin, Tex., for defendant-appellee.

Before CLARK, Chief Judge, GOLDBERG and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

This matter was returned to this panel for disposition in accordance with the special order we entered on remand, *Rumbaugh v. McKaskle*, 730 F.2d 291 (5th Cir. 1984). We now consider the appeal of Harvey and Rebecca Rumbaugh from the decision of the district court, *Rumbaugh v. Estelle*, 558 F.Supp. 651 (N.D.Tex.1983), denying their request to present a next friend petition for writ of habeas corpus on behalf of their son, Charles Rumbaugh, a death-sentenced state prisoner. Charles Rumbaugh continues to refuse to seek collateral review of his conviction and sentence and continues to resist the efforts of his parents to secure that review. Harvey and Rebecca Rumbaugh maintain that their son lacks the mental capacity to waive or forgo his rights to collaterally attack his death sentence. After an exhaustive review of this record, including a review of the tortuous and bizarre course this litigation has followed, we conclude that the district court was correct in finding and concluding that Charles Rumbaugh possesses the requisite mental competence to decline to exercise his rights to secure collateral review of his conviction and sentence. Accordingly, we affirm.

### Facts and Procedural Background

Charles Rumbaugh was first convicted of capital murder and sentenced to death by a Texas state court on April 4, 1975. This conviction was reversed on appeal by the Texas Court of Criminal Appeals on the ground that inadmissible evidence had been admitted. *Rumbaugh v. State*, 589 S.W.2d 414 (Tex.Cr.App.1979). At the retrial Rumbaugh was again convicted of capital murder and sentenced to death. The second conviction was affirmed on direct appeal, *Rumbaugh v. State*, 629 S.W.2d 747 (Tex. Crim.App.1982). Following affirmance of the second conviction Rumbaugh asked his court-appointed counsel to take no further steps to attack his conviction and sentence. When counsel ignored this request and moved for a rehearing, Rumbaugh wrote the Clerk of Court for the Texas Court of Criminal Appeals and requested that all motions filed by his counsel be withdrawn and that a mandate of affirmance issue forthwith. The court obliged and the mandate issued. Rumbaugh then wrote the state trial judge requesting that his execution be set without further delay. Rum-

baugh's execution was set for July 23, 1982. Rumbaugh refused to authorize anyone to file a petition for writ of certiorari or to seek a stay of execution.

On July 16, 1982, Harvey and Rebecca Rumbaugh filed a next friend application for state habeas relief. Their petition was denied without hearing or written reasons on July 19, 1982. Later that same day, the Texas Court of Criminal Appeals denied the senior Rumbaughs' motion for stay of execution and application for habeas relief. No reasons were assigned. On July 20, 1982, the district court for the Southern District of Texas granted Harvey and Rebecca Rumbaugh's motion for stay of execution and transferred the case to the Northern District of Texas, Amarillo Division.

The district court in Amarillo appointed counsel to represent Charles Rumbaugh and held a preliminary hearing to determine the procedures to be followed in this relatively unusual situation. Upon conclusion of that hearing the district court ordered Charles Rumbaugh transferred to the United States Medical Center, Springfield, Missouri, to be examined for the specific purpose of determining his mental competence to waive further review of his conviction and sentence.

Charles Rumbaugh was taken to Springfield and there examined by a team of psychiatrists and psychologists. The written reports of Drs. Logan and Reuterfors were presented to the court and the parties. At a hearing on February 4, 1983, a psychiatrist and two psychologists, called by the petitioners, none of whom had examined Charles Rumbaugh, testified as to their interpretations of the Springfield medical reports and gave their opinions on the mental state of Charles Rumbaugh. A doctor called by the state gave counter-testimony. At the conclusion of that conflicting testimony, the district court continued the hearing so that Dr. Logan could personally appear and explain his diagnosis and prognosis.

The hearing resumed on February 24, 1983, with Dr. Logan present. After Dr. Logan finished his testimony, Charles Rumbaugh voluntarily took the stand and advised the court of his position in the matter:

Well, I don't feel I'm depressed right now. I haven't been taking any medication for approximately thirty days. I was taking medication, an antipsychotic drug, and I haven't experienced any problem since I quit taking it.

And I think I understand my situation very well and I believe my decision is a logical and rational one.

And it doesn't really matter to me what this Court decides today because I've already made the decision to take matters into my own hands.

So it doesn't make any difference.

\*     \*     \*     \*     \*     \*

All I really wanted to say is that it doesn't matter to me; that I've already picked my own executioner and I'll just make them kill me. If they don't want to do it ... if they don't want to take me down there and execute me, I'll make them shoot me.

\*     \*     \*     \*     \*     \*

I think I'll make them shoot me right now.

Charles Rumbaugh then pulled a homemade knife-like weapon from his pocket and advanced on the deputy U.S. Marshal, shouting "Shoot!" The Marshal was forced to shoot Rumbaugh. After life-saving measures were taken, over Charles Rumbaugh's demands that no attempts be made to save his life, and he was removed by ambulance to the hospital, the hearing continued. Dr. Logan, who had witnessed the entire episode, was recalled to the stand. He testified that the bizarre occurrence did not shake his opinion but actually reinforced his conclusions that Rumbaugh was acting knowingly and intentionally with full knowledge and appreciation of the situation in which he found himself.

The district court sifted and weighed the evidence and concluded that Charles Rumbaugh was mentally competent to make the decision to forgo further judicial proceed-

ings. This finding resulted in a preemption of his parents' next friend petition and it was dismissed.

Rumbaugh's parents appealed the finding of competence. After oral argument and while the matter was under submission to this court, Rumbaugh filed a *pro se* application for a writ of habeas corpus in state court, simultaneously requesting that this court be notified of his act. He argued that the state filing mooted the issues on appeal requiring a dismissal of the appeal. We responded with the special order earlier noted, 730 F.2d 291, remanding the application of Harvey and Rebecca Rumbaugh to the district court with instructions to monitor the progress of the state habeas petition. We instructed the district court to return the record to this court for disposition of the appeal in the event that any act or omission of Charles Rumbaugh prevented a decision on the merits of his state habeas application. Several months later, the state court dismissed the habeas petition in response to a motion by Charles Rumbaugh in which he stated that he had filed the state action to force dismissal of his parents' federal petition and, failing in that endeavor because of the provisions of the special order, he desired to withdraw his state petition. In accordance with our special order, the matter was returned in due course to this panel for disposition of the appeal by Harvey and Rebecca Rumbaugh.

### Discussion

If Charles Rumbaugh lacks the mental competence to waive his rights to further judicial review of his conviction and sentence, his parents have standing to bring an action for habeas relief as next friends. If he has that competence, his parents have no standing to bring the present action.

*Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976).

### *The Standard for Competency to Waive the Right to Attack a Conviction and Sentence*

■ The Supreme Court announced the standard to be used in deciding whether a person is mentally competent to choose to forgo further appeals and collateral attack upon his conviction and sentence in *Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966).[1] The test is

> whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.

384 U.S. at 314, 86 S.Ct. at 1506. This test requires the answer to three questions:

> (1) Is the person suffering from a mental disease or defect?
>
> (2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?
>
> (3) If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?

If the answer to the first question is no, the court need go no further, the person is competent. If both the first and second questions are answered in the affirmative, the person is incompetent and the third

---

**1.** Immediately prior to stating the test, the Supreme Court noted that it would "retain jurisdiction over the cause in this Court and direct the District Court to determine Rees' mental competence in the present posture of things...." 384 U.S. at 314, 86 S.Ct. at 1506.

Insofar as the published reports reflect, nothing further was done until April 10, 1967 when the Court ordered: "This case is held without

action of the petition [the pending application for certiorari to the United States Court of Appeals for the Fourth Circuit] until further orders of the Court." No. 9, Misc. *Rees v. Peyton,* 386 U.S. 989, 87 S.Ct. 1310, 18 L.Ed.2d 333 (1967).

The case continues to date in a pending status before the Court, carried on the Supreme Court's Special Docket as item S–2. No further action has been reported.

question need not be addressed. If the first question is answered yes and the second is answered no, the third question is determinative; if yes, the person is incompetent, if no, the person is competent. We find no reported case applying the *Rees* standard to a defendant's decision to forgo further appeals and collateral proceedings which decides how a court should treat a mental disease which does not impair the cognitive function but impacts only on the volitional, the person's ability to make a rational choice among available options.[2] We must now address that issue. We find it to be essentially a factual question. The district court's finding is thus protected by the shield and buckler of Fed.R.Civ.P. 52(a), and must be accepted unless shown to be clearly erroneous. *Floyd v. United States,* 427 F.2d 63 (5th Cir.1970).

### The Evidence

██ During the court-ordered stay at Springfield, Charles Rumbaugh was tested and observed by a team of psychiatrists and psychologists who were charged by the court to determine his competence consistent with the teachings of *Rees.* The trial judge's order to the Springfield staff is a verbatim statement of the *Rees* standard.[3] The evaluation resulted in a 12-page psychiatric evaluation by Dr. Logan and a 9-page psychological evaluation by Dr. Reuterfors. The team also composed 22 questions which Rumbaugh answered in detail over a period of several days. The questions and answers were presented to the district court. Dr. Logan's final opinion advised:

This examiner feels that Mr. Rumbaugh is currently profoundly depressed. Mr. Rumbaugh, despite this depression, does

have the capacity to appreciate his position and his choice regarding continuing to decline further litigation is rational in light of his past experience and presuming one can rationally make a decision to die. It must be emphasized, however, the extent of Mr. Rumbaugh's depression does substantially affect his capacity in the premises. Mr. Rumbaugh's perception of his current situation as hopeless, although realistic in light of his past experience is a reflection of this depression.

Dr. Reuterfors' report reflected a similar apparent anomaly:

(1) it is the opinion of the undersigned examiner that Mr. Rumbaugh is currently capable of appreciating his position and making a substantially and sufficiently rational choice with respect to continuing or abandoning further litigation.

(2) it is the opinion of the undersigned examiner that Mr. Charles Rumbaugh is presently suffering from a major mental illness which may substantially affect his capacity in the premises.

The district court was understandably puzzled by these seemingly self-contradictory responses to the *Rees*-directed question it had posed. And, as earlier noted, at the hearing after the Springfield evaluation, one psychiatrist and two psychologists who had not examined Rumbaugh, offered their interpretation of the Springfield reports. After reviewing the reports and Rumbaugh's answers to the battery of questions, these medical experts expressed the opinion that Rumbaugh was not capable of making a rational choice about fur-

---

2. *Lenhard v. Wolff,* 444 U.S. 1301, 100 S.Ct. 241, 62 L.Ed.2d 11 (1979) (failure to prove mental illness), *vacating stay of execution,* 444 U.S. 921, 100 S.Ct. 241, 62 L.Ed.2d 177 (1979); *Evans v. Bennett,* 440 U.S. 1301, 99 S.Ct. 1481, 59 L.Ed.2d 756 (1979) (failure to prove mental illness), *vacating stay of execution,* 440 U.S. 987, 99 S.Ct. 1986, 60 L.Ed.2d 370 (1979); *Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976) (failure to prove mental illness); *Hays v. Murphy,* 663 F.2d 1004 (10th Cir.1981) (remanded to take evidence on issue of mental illness and competency).

3. The district court's order called for an examination to determine

whether Charles Rumbaugh has the capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand, whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.

558 F.Supp. at 652.

ther litigation. Based on these same reports, another medical expert called by the state opined that Rumbaugh was capable of making a rational decision to forgo further judicial proceedings.

The trial court cut the gordian knot by continuing the hearing and directing that Dr. Logan personally appear and explain his report. At the continued hearing, Dr. Logan testified at length, including this colloquy:

Q. And what was your determination?

A. My determination was that he had a very rational understanding of his current legal position. He had an excellent knowledge of past events that had happened in his case; he had a very good understanding of his current situation, both legally and in terms of his own mental health.

However, the second part of the question asked whether he had any mental illness that could ... that may affect him in the premises. And I answered yes to that. I said I believe he was suffering from a severe depression and that, indeed, did have some influence on his decision.

Q. Now, of course, under the standard of competency to stand trial test, you would have found that he was competent to stand trial and to confer with his lawyers and so on?

A. Yes.

Q. Explain, if you can, Doctor, the conflict ... or apparent conflict in your determination?

It may not be a conflict. It appears so to me.

A. Okay. The fact that someone has a mental illness in all cases does not preclude their ability to have a rational understanding of their current situation or logical understanding of their current situation.

The majority of the time, I believe, Mr. Rumbaugh is functioning at a level where he does have a rational understanding of what's going on in his case and his current situation.

The way in which his depression could influence him is that it may act as a coercive force and impairing his ability to exercise free will to make a decision, perhaps a way to explain it would be to use an analogy that comes from a different realm.

Many patients that are dying with terminal cancer are very depressed. Their cognitive abilities are not necessarily impaired. They have a very rational understanding of their situation. They realize that they are due to die within, perhaps, a short period of time, that the treatment with chemotherapy or radiation therapy may be painful and uncomfortable and it may impair what little life they have left and in some cases they may decline any further treatment and essentially choose to die.

Their depression in that case, however, although realistic, does influence their decision.

\* \* \* \* \* \*

Q. And that that mental illness affects his competency in the premise?

A. In the way I have so stated. In fact, I don't think it impairs him for the majority of the time. There are periods when he has brief paranoid psychoses where he has auditory hallucinations but that's not all the time. Those are circumscribed episodes.

I feel like underlining that. The majority of the time, he is depressed and the way that affects him is that it may act ... his own psychological pain may act as a coercive force that influences him not to want to say, live in his current condition for an additional, say, six years to exhaust his further appeals that are open to him.

\* \* \* \* \* \*

Q. ... I think what we're all trying to understand is to what extent; for example, the depression constituted a coercive force.

A. To the extent, if he were not so depressed, if he did not suffer from frequent bouts of paranoia or auditory hal-

lucinations, he probably would decide to continue with appeals.

Q. Could you repeat that again for me, please?

A. Yes. It affects him to the extent that were his depression not present, were his periods of paranoia not present, were his periods of auditory hallucinations on occasion not present, were he not so hopeless about his position, he might be able to better mentally cope with spending an additional eight years on death row in Huntsville and continue with the appeals.

But his mental condition is not that would permit him to do so.

\* \* \* \* \* \*

Q. Would you also believe his hopelessness is based on the realistic appreciation of what those circumstances are?

Is that correct?

A. Unfortunately, I think to a large extent, it is realistic.

\* \* \* \* \* \*

Q. I believe that you testified a little bit ago that it was ... that it was questionable ... or that Mr. Rumbaugh was probably not acting out of free will in deciding that he's going to waive his further appeals?

A. Diminished. Okay. Free will is on a continuum, I believe.

\* \* \* \* \* \*

A. But the question ... the second part of the question was very ... was worded in such a way that it said, is he suffering from a mental disease that may substantially affect. It was very broad.

Q. Okay. By may, do you ... is it also possible that it may not; is that what you're saying?

A. No. I think in his case, it has to be a factor that has to be looked at and addressed by the Court. I think it does influence him to a certain degree, maybe even a substantial degree.

\* \* \* \* \* \*

Q. Do you think that ... do you think that a terminal cancer patient experienc-ing pretty severe depression can make a rational choice to end his own life?

A. Yes, I believe he can. I don't think the fact that someone is depressed or they're facing overwhelming life circumstances means that they're irrational about any choice to either live or die necessarily.

Some people may be. Like if Mr. Rumbaugh was in a psychotic state where his perception of the world was grossly distorted and one would certainly argue then that perhaps his decision in any regard, either to continue with appeals or not to continue appeals was not based on rational reason.

But at least the reasons he gave to me during this course of evaluation seemed to be pretty rational reasons for pursuing his course of action.

And I think there was a list of questions we submitted to him, I think it's very important for all parties concerned to review his answers to those because I think they were very cogent answers for the most part.

Q. So I believe in your report and in your testimony, it's your professional opinion that any depression that Mr. Rumbaugh may be experiencing at the present time does not impair his ability to make a rational choice about what to do, to understand the situation that he's in and to realistically assess the options available to him, is that correct?

A. His assessment of his options, his current legal situation was very factual, it was very logical.

\* \* \* \* \* \*

Q. He then basically in your opinion does recognize the ... his mental condition as deteriorating where he's at?

A. Yes, he does.

Q. And that that in effect is partially or at least has some influence on his desire to waive his appeals?

A. Yes. Not only his current conditions influence him but also he's fairly pessimistic, realistically so, unfortunately,

about his future prospects, even if the appeals were successful.

* * * * * *

THE COURT: Doctor, let [me] tell you what I'm hearing you say and you tell me if I'm hearing you correctly.

THE WITNESS: Okay.

THE COURT: What I'm hearing you say is that Mr. Rumbaugh has been miserable for a very long time.

THE WITNESS: That's true.

THE COURT: That he's miserable now.

THE WITNESS: Yes.

THE COURT: And he expects to be miserable in the future.

THE WITNESS: Yes.

THE COURT: That based on the personality that he has and based on the circumstances in which he's now placed, that that assessment that he will be miserable in the future is realistic.

THE WITNESS: Yes, it is.

THE COURT: And that he has ... he is able to think coherently.

THE WITNESS: Yes.

THE COURT: He's able to understand what's going on.

THE WITNESS: Yes.

THE COURT: And his decision is rational based on what he presently faces.

THE WITNESS: Yes, it is. Based on his past experience and what he presently faces, I believe it's rational, or logical, at least.

THE COURT: All right. Do you want to elaborate on what I'm ... is there something I'm not hearing that you're trying to say?

THE WITNESS: No, I think you're hearing it very well.

As we appreciate Dr. Logan's reports and testimony, and considering Rumbaugh's written answers to the extensive questions posed, it appears that Charles Rumbaugh is able to feed relevant facts into a rational decision-making process and come to a reasoned decision; that one of the facts fed into the process is that Rumbaugh is mentally ill, he has severe depression, with no hope of successful treatment which would reduce his current mental discomfort to a tolerable level or enable him to exist in the general prison population or the outside world if his appeals were successful; that Rumbaugh's assessment of his legal and medical situations, and the options available to him, are reasonable; but that if the medical situation *vis-a-vis* treatment were different, Rumbaugh might reach a different decision about continuing judicial proceedings. In other words, Rumbaugh's disease influences his decision because it is the source of mental pain which contributes to his invitation of death.

Rumbaugh's written answers to the questions and his statements to the doctors and to the court clearly reflect his awareness of his legal situation and of his right to file state and federal habeas petitions. His answers to the questions list several arguably sound grounds for attack which could not be summarily rejected. Rumbaugh indicates adequate awareness of this reality. He understands his situation and his options. His ability to make the life/death choice is apparent from his comments to Dr. Logan that if he thought that meaningful treatment were available and if it were offered, he would probably change his decision not to appeal. We find that decision to be the product of a reasonable assessment of the legal and medical facts and a reasoned thought process, albeit one that we would disagree with.

Our conclusion that the evidence supports the district court's finding of competency is reinforced by Rumbaugh's actions after the district court's decision and while the appeal was under advisement. He filed an extremely coherent and well-reasoned *pro se* state habeas corpus petition. That petition states substantial grounds for attacking his conviction and sentence. When it became apparent that this appeal would not be dismissed because of the state petition, he withdrew his *pro se* petition, stating in his motion to dismiss that he believed the grounds substantial and well-founded but that he was making the choice not to appeal.

Rumbaugh has striven mightily to prove his mental competence to make his legal decisions. He convinced the district court who presided over the dramatic hearings. We cannot tag that finding as clearly erroneous. Nor can we conclude as a matter of law that a person who finds his life situation intolerable and who welcomes an end to the life experience is necessarily legally incompetent to forgo further legal proceedings which might extend that experience. *Gilmore v. Utah.*

AFFIRMED.

GOLDBERG, Circuit Judge, dissenting:

A majority of this panel has concluded that Charles Rumbaugh is competent to waive whatever rights stand between him and state-imposed death. Despite the existence of substantial questions regarding the constitutionality of his sentence, we are told that no one will be allowed to press these issues on his behalf because the district court's pronouncement of competency was not clearly erroneous. We are told not only that we cannot scrutinize the validity of an admittedly hair's-breadth call by a single judge but also that this man is not necessarily competent—he has merely not been proved incompetent. We are told that four out of five doctors surveyed think he suffers from a mental disorder affecting his moods, his attitudes, his self-conception, and his processes of logical thought, but that these effects are insufficient to prove him "irrational." We are not told whose definition of rationality applies to this mind, but we are told nonetheless to invoke some nebulous normative concept imbued with an aura of systemic legal perfection. As a result of these borderline reflections of subjective impression, no one will be permitted to argue that we punish him unconstitutionally.

With all due respect to my brethren, I am incredulous that anyone could fairly read the record as establishing this person's competency to waive next-friend collateral review of his conviction and sentence. In my view, the trial court misapplied the standard of competency enunciated in *Rees v. Peyton*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966) (per curiam), *held without action on petition for cert.*, 386 U.S. 989, 87 S.Ct. 1310, 18 L.Ed.2d 333 (1967);[1] even under its cryptic interpretation of *Rees*, the court below clearly erred on the factual question of whether this defendant is competent. Further, I do not view the determination of competency under *Rees* to be a pure question of fact warranting appellate abdication under the clearly erroneous rule. Whether a defendant is competent to waive federal habeas review in a death case presents a mixed question of fact and law whose resolution turns primarily on the application of a legal standard. The law in this circuit requires that we review de novo a district court's resolution of such hybrid issues. Finally, I cannot countenance as a constitutional matter a rule of law that is susceptible of the application we witness today. In my view, the cruel and unusual punishments clause of the eighth amendment and the due process clauses of the fifth and fourteenth amendments require that the state bear the burden of proving a defendant's competency to waive federal collateral review in a death case. The state's interest in swift and efficient punishment need not eviscerate its interest in maximal certainty of application.

## I

In *Rees v. Peyton*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966) (per curiam), the Supreme Court stated what has become

---

**1.** As noted by the majority, at 398 n. 1, the Supreme Court has not spoken on the application of *Rees*'s standard of competency to waive federal collateral review. Had the Court relinquished its near 20-year assertion of jurisdiction in *Rees*, we would at least have available a standard that had been passed on in practice as well as in theory. *Cf. Dusky v. United States,*

362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam) (stating standard for competency to stand trial and remanding to district court for additional findings of fact). The lower federal courts should be reticent to apply elusive standards of competency that have been enunciated in cases whose ultimate resolution remains similarly elusive.

the standard by which an individual is deemed competent or incompetent to assert his rights for purposes of conferring standing on next-friend petitioners. On the one hand, if the individual "has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation," then he is competent to waive collateral federal review, and next-friend petitioners do not have standing to petition on his behalf. *Id.* at 314, 86 S.Ct. at 1506. On the other hand, if "he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises," then he is incompetent, and the federal courts have jurisdiction to entertain next-friend petitions. *Id.; see infra* note 15.

The structure of the *Rees* standard suggests that "rational choice" comprises two elements.[2] First, the notion requires that a person choose means that relate logically to his ends. If a person's ability to reason logically is seriously impaired, he is incapable of rational choice. Second, rational choice requires that the ends of his actions are *his* ends. That is, rational choice embraces "autonomous" choice. If a person takes logical steps toward a goal that is substantially the product of a mental illness, the decision in a fundamental sense is not his: He is incompetent.

This two-pronged concept of rationality follows from the structure of the *Rees* standard. Under *Rees*, a person *either* is capable of rational choice *or* has a mental disease that "substantially affects his capacity in the premises," but he cannot have *both* conditions. If *Rees* were read to require only an inquiry into the person's ability to reason *logically*, without an inquiry into the person's autonomy, then both conditions would be possible. Yet a person can be both logical and have a mental disease that "substantially affects his capacity in the premises," i.e., that affects what the person in an ultimate sense desires. Indeed, this is precisely the situation in the present case, where the doctors testified that although Rumbaugh is capable of logical thought, his depressive condition substantially affects his capacity in the premises.

## II

In determining that Rumbaugh is "mentally competent to make a rational choice with respect to continuing or abandoning further litigation," the district court did not elaborate on the elements entailed in *Rees*'s concept of "rational choice." To the contrary, by equating "rational" with "logical," the court below disregarded substantial, uncontroverted testimony that Rumbaugh's state of depression diminishes his capacity for free, autonomous choice.[3] Because this equation reflects an incorrect understanding of the *Rees* standard, I would reverse on this ground alone. In addition, even assuming a proper understanding of *Rees* in the court below, and assuming for the moment that the trial court's pronouncement of competency constitutes a finding of fact reviewable under the clearly erroneous standard, I cannot agree with the majority that "it appears that Charles Rumbaugh is able to feed relevant facts into a rational decisionmaking process and come to a reasoned

---

2. Although *Rees* requires a determination of whether the defendant can make a "rational choice," it contains no definition of rationality. Since the nature of rationality is one of the most vexing and debated questions of contemporary philosophy, *see, e.g., Rationality* (B. Wilson ed. 1970), this black hole makes the *Rees* standard of competency far from self-evident.

3. The trial court's misunderstanding is evident in its principal finding of fact, which implicitly linked Rumbaugh's "realistic understanding of his present position and of the choices available to him" with the conclusion that Rumbaugh "is mentally competent to make a rational choice

with respect to continuing or abandoning further litigation." *Rumbaugh ex rel. Rumbaugh v. Estelle*, 558 F.Supp. 651, 654 (N.D.Tex.1983). Further, the district court stated a version of testimony to the effect that Rumbaugh's "decision to appeal is rational *or at least logical* in light of the options which are presently available to him." *Id.* at 653 (emphasis added). The court thus failed to recognize the difference between a logical, cognitive capacity, which can be reflected in a realistic appreciation of one's legal and psychological status, and a rational decision, which by definition contemplates a goal that is the product of one's free will.

decision." At 402. Viewing the record as a whole, I am firmly convinced that a serious injustice has been committed. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). If we are willing to say "clearly erroneous" in battles over dollars and cents, *see, e.g., Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980), surely the rule is more than a rubber stamp when rigor-mortis becomes the order of the court.[4] Indeed, this is not a case where the whole is greater than the sum of its parts: almost every item of expert testimony points to the inability of this man to decide how to exercise his rights for his own benefit. In plainer language, Charles Rumbaugh does not know where his best interests lie, and the district court's determination of competency is clearly erroneous.

*Rees* compels a finding of incompetency upon the mere possibility that an individual's mental impairment substantially affects his decisionmaking capacity. The battery of examinations to which Rumbaugh was subjected, as well as their subsequent explication and interpretation before the trial court, cannot be read to suggest anything other than that he is incompetent to waive his remaining rights under *Rees.* When the question of Rumbaugh's competency first arose, a preliminary psychological test was conducted at the Ellis Unit of the Texas Department of Correction. The report concluded that "Rumbaugh is most probably or in all reasonable medical probability unable at the present time to exercise his legal and constitutional rights as a result of the large compressive component and schizophrenic illness which he is currently suffering from," and the examining physician recommended further in-depth testing at the United States Medi-

cal Center for Federal Prison in Springfield, Missouri.

The trial court referred the issue of Rumbaugh's competency under *Rees* to the federal facility at Springfield, where the doctors issued psychiatric and psychological report of his mental fitness. In the psychiatric report, Dr. Logan concluded:

This examiner feels that Mr. Rumbaugh is currently profoundly depressed. Mr. Rumbaugh, despite this depression, does have the capacity to appreciate his position[,] and his choice regarding continuing to decline further litigation is rational in light of his past experience and presuming one can make a rational decision to die. It must be emphasized, however, the extent of Mr. Rumbaugh's depression does substantially affect his capacity in the premises. Mr. Rumbaugh's perception of his current situation as hopeless, although realistic in light of his past experience, in [sic] a reflection of this depression.

In a similar vein, Dr. Reuterfors reported in his psychological evaluation:

(1) ... Mr. Rumbaugh is currently capable of appreciating his position and making a substantially and sufficiently rational choice with respect to continuing or abandoning further litigation.

(2) ... Mr. Charles Rumbaugh is presently suffering from a major mental illness which may substantially affect his capacity in the premises.

The Logan and Reuterfors reports spawned an apparent dilemma. *Rees* dictates that an individual can either be rational or can suffer from a mental impairment that might substantially affect his capacity in the premises. The Springfield reports suggested either that both characterizations applied to Rumbaugh—an apparent impossibility under *Rees*—or that the doctors had applied *Rees*'s operative

---

**4.** As the Supreme Court has recognized, "[T]here is great value in appellate courts showing deference to the factfinding of local trial judges. The clearly erroneous standard serves that purpose well. But under that standard, the role and duty of the Court of Appeals are clear: it must determine whether the trial court's findings are clearly erroneous, sustain them if they are not, but set them aside if they are." *Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 534 n. 8, 99 S.Ct. 2971, 2977 n. 8, 61 L.Ed.2d 720 (1979) (citation omitted).

language differently from what the *Rees* Court had contemplated.

Faced with these ambiguities, the district court heard testimony from one psychiatrist and two psychologists.[5] Although one of the doctors had himself previously examined Rumbaugh, the three doctors' testimony was based chiefly on the Logan and Reuterfors reports as well as on Rumbaugh's written responses to a questionnaire that had been administered by Logan. The first of the three, Dr. Kaufman,[6] testified unequivocally that, as he read the Springfield evaluations, Rumbaugh has a disease that affects his ability to choose rationally whether to appeal. Record vol. 1, at 66, 68–70, 84, 89, 94–95, 118. In Kaufman's view, Logan and Reuterfors attributed Rumbaugh's desire to commit suicide to his depression. In response to the seemingly persuasive argument that Rumbaugh had written cogent and logical responses to a series of questions submitted by Logan, Kaufman explained that such reasoned analysis is inherent in any diagnosis of a major depressive disorder. *Id.* at 74–75. If Rumbaugh's responses had evidenced looseness of association, Kaufman explained, the diagnosis would most likely have shifted from one of depression to schizophrenia. In essence, Rumbaugh's decision to abandon appeal was an effort to secure the state's assistance in committing suicide, *id.* at 80, and the decision to commit suicide was the direct product of severe depression, *id.* at 125, 128–29.

Significantly, Kaufman refuted even the most favorable reading of Reuterfors's enigmatic conclusion. The Attorney General confronted Kaufman with the theory that Reuterfors's primary opinion was that Rumbaugh was rational, and that Reuterfors subsequently modified this diagnosis because there was "some reason to doubt the certainty of the conclusion." *Id.* at 106. Kaufman responded that the qualification was made because there was great

reason to doubt Rumbaugh's competency. The examining doctors addressed whether Rumbaugh's capacity was *substantially* affected. *Id.* at 108. On Kaufman's unrelenting view, even the state's attorney was forced to concede that "the depression ... is what underlies the fact that [Rumbaugh] is affected or substantially [a]ffected." *Id.*

The next witness was Dr. Dickerson, a psychologist who had in the past pronounced at least one other inmate in Rumbaugh's precarious legal position competent to waive his right to appeal. *Id.* at 150. Dickerson nonetheless testified that Rumbaugh's depression was of such a serious magnitude that it colored all of the prisoner's thought processes. *Id.* at 133, 135. Noting that both Logan and Reuterfors had significant reservations about Rumbaugh's competency, *id.* at 134, Dickerson observed that the defendant's history of self-destructive behavior supported the belief that the decision necessarily reflected his disease—even though Rumbaugh was able to articulate logical and coherent bases for his chosen inaction:

A. [W]hatever it is that we want, we usually find a way to logically explain it or justify it ....

With Mr. Rumbaugh, I think that he has a very long history of intended kinds of self-destructive activity[,] and it's clear, to me at least, that that pattern is still very much in operation.

Q. Would you describe those as suicidal tendencies?

A. Some of them are suicidal attempts; some of them are attempts at self-mutilation. I mean how upset do you have to be in life to take sharp objects and tear your arms up and to rip yourself from shoulder to hip; how upset do you have to be with yourself and with your life to take and start hacking on your neck with various things to try to make yourself bleed to death ...[?]

---

5. The court also heard from a second psychiatrist who did not speak to Rumbaugh's competency but who testified instead about the nature and length of the examination that would be required. Record vol. 1, at 12–35.

6. Kaufman's testimony took the form of a videotaped deposition that was played before the trial court.

But even those kinds of things can be quite logically described as being acts of purification, as being acts of self-cleansing and described as "feeling good."

*Id.* at 134–35.[7] Insofar as Rumbaugh's logical articulations might be construed as undermining the other, more compulsive manifestations of his depressive disorder, Dickerson identified the relevant question as being whether Rumbaugh's logic operates in service of his irrationality. *Id.* at 142–43. The witness concluded without qualification that it does. *Id.* at 136, 142, 148, 151, 155.

The second psychologist was called to testify by the state. Relying almost solely on Rumbaugh's written answers to the questionnaire, Dr. Parker stated that the cogency of Rumbaugh's responses indicated his rationality. *Id.* at 177–78, 180, 185, 187. Two factors, however, throw Parker's testimony into a questionable light. First, he equated logical thought with rational choice. Inferring from Rumbaugh's ability to reason logically that Rumbaugh was capable of rational choice, Parker failed to address the view that logical tightness of thought is compatible with, if not inherent in, any diagnosis of depression. *See supra* at 397, 399. I think we would all agree that Rumbaugh was not capable of rational choice during his bouts of auditory hallucinations, drug involvement, paranoia, self-mutilation, and attempted suicide. The Springfield reports and the expert testimony reveal that none of these symptoms or conditions, any more than the depression itself, diminished Rumbaugh's ability to express himself. Consequently, Rumbaugh's ability to respond logically to questions does not demonstrate his rationality.

Second, Parker's testimony on direct examination relied in part on the results of a Minnesota Multiphasic Personality Inventory ("MMPI") test that was administered to Rumbaugh at Springfield. Record vol. 1, at 162–72. Although the administering and other testifying doctors all questioned the validity of the results due to the extremity of Rumbaugh's score, and although under

7. The referenced acts appear in the Springfield psychiatric evaluation. On one occasion, Rumbaugh had "cut himself from his collarbone to his right hip; another time, he had inflicted wounds on his abdomen, chest, and arms. In addition, he indicated that he had made numerous suicide attempts and had slit his wrists several times.

Rumbaugh's written response to an item on the Logan questionnaire limns the most vivid portrait:

15. I have seriously attempted suicide on only a few occasions. At other times I have lacerated or mutilated myself to experience the pain and be cleansed by it. The pain is beautiful in that it helps to atone for my transgressions and leaves me feeling cleansed in body and spirit. It is a form of self-flagellation not unlike that which was practiced by an ancient religious sect I recall reading about and being fascinated by. They practiced self-flagellation and self-mutilation in atonement for their misdeeds and I am sure they rejoiced in the cleansing pain as I do. I can look at the scars that crisscross my body and feel good in the knowledge that I have suffered extreme pain in atonement for my many transgressions against what I know to be right and proper conduct. I occasionally feel the need to cleanse myself by subjecting myself to pain through self-mutilation. Also, the more pain I experience the higher my threshold to pain becomes and I become more and more able to easily withstand great pain. My scars may seem obscene to people who do not realize what they symbolize, but to me they are beautiful. They are like tatoos. I can look at them and touch them and remember.

Shortly after my arrest in 1975, I was sitting in my cell and I heard a voice speaking clearly to me and commanding "If thy right hand offends thee, cut it off". It made me feel very good because I believed a supreme being was commanding me. My right hand had indeed offended me because it was my right hand that took a man's life, perhaps a good man who was able to cope with life and had never hurt or harmed anyone in any way although he made me kill him. So, in response to the command, I took a razorblade and began trying to cut my right hand off at the wrist, but I became frustrated and angry because it would not cut through the bone. I went into a frenzy and began slashing the flesh of my arm from the wrist to the elbow. There was dark red blood everywhere and I gloried in the extreme pain I was experiencing. When the guards found me they took me to the hospital where doctors sewed me up and then I was taken back to jail and thrown into the dark solitary cell, but I felt very good about it for several days thereafter.

cross examination he finally relented in his emphasis on the test, Parker never explained how the discrediting of the MMPI results affected his diagnosis. *See id.* at 193.

The final witness, Dr. Logan, was called on the trial court's initiative. Although Logan's testimony cannot be viewed in isolation from the preceding experts', as the author of the Springfield psychiatric evaluation, Logan was in the best position to clarify the meaning of his apparently inconsistent conclusion that Rumbaugh both is rational and has a mental disease that substantially affects his capacity in the premises.

While the district court and the majority properly recognize Logan's significance, each misinterprets either his statements or the *Rees* standard itself. With regard to the district court's opinion, the inference from Logan's testimony is compressed almost entirely into the conclusory statement, "After considering all of the evidence the Court finds that Charles Rumbaugh has a realistic understanding of his present position and of the choices available to him, and that he is mentally competent to make a rational choice with respect to continuing or abandoning further litigation." 558 F.Supp. at 654. The opinion merely recapitulates Logan's testimony that Rumbaugh's depression is based on a realistic assessment of his mental problem and the circumstances facing him, that he thinks coherently, and that "his decision not to appeal is rational or at least logical in light of the options which are presently available to him." *Id.* at 653; *see supra* note 3.

Read in context, these observations do not convincingly support Rumbaugh's competency under *Rees*. Logan maintained throughout his testimony that accuracy of perception and apparent rationality in light of present circumstances and future expectations is not inconsistent with the existence and substantial effects of Rumbaugh's mental illness. He stated, for example:

[Rumbaugh] was suffering from a severe depression and that ... did have some influence on his decision.

. . . .

... The fact that someone has a mental illness ... does not preclude their ability to have a rational understanding of their current situation or logical understanding of their current situation.

. . . .

The way in which his depression could influence him is that it may act as a coercive force and impairing [sic] his ability to exercise free will to the extent a normal individual might be able to use free will to make a decision. . . .

. . . .

His judgment is effected [sic] in some degree by his depression even though it's realistic.

. . . .

[I]f he were not so depressed, if he did not suffer from frequent bouts of paranoia or auditory hallucinations, he probably would decide to continue with appeals.

. . . .

... [Rumbaugh's mental disease] has to be a factor that has to be looked at and addressed by the Court. I think it does influence him to a certain degree, maybe even a substantial degree.

. . . .

A. Specifically, the effect that I believe his depressive illness has is the fact that it may ... although it's based on realistic perception, may act as a coercive force[,] and it's not just the depression that I'm talking about, but there are things that go along with the depression, the sleep, the appetite loss, living in a constant of emotional turmoil, periodic bouts of psychosis, acts as a coercive force that may be indicating ... be causing him to decline any further appeals at this time and ending ... thus, resulting in ending his own life; whereas, if he were not so depressed, if his mental state were not as it is, if he were, perhaps, not quite so severely depressed, if he didn't have these recurrent bouts of paranoia,

he might, indeed, opt to continue with appeals with the hope that he could receive a different type of care in the future that might change his condition.

Q. So, in your opinion, it may substantially effect [sic] his competency to make that decision; that's what you said in your narrative, isn't it?

A. Yes.

Q. And that's still your opinion?

A. Yes.

. . . .

[Q.] What I'm trying to do is figure out where on [some] scale Mr. Rumbaugh falls with regard to the depression effecting [sic] his mental state or his decision[.]

A. I think you would have to say it's substantial, because if it were not present to the degree it is, his course of action would conceivably be different.

Record vol. 1, at 212, 213, 216–17, 224, 236, 243. If Logan's testimony is to be deemed largely dispositive on the issue of Rumbaugh's competency, I cannot countenance a finding other than that his defect may substantially affect his capacity in the premises.

The nub of the district court's and majority's resolution is that Rumbaugh appreciates his circumstances and can reason logically. On this view, a person's cognition, his understanding, is deemed tantamount to an ability to choose rationally. The argument is rooted in statements such as, "His assessment of his options, his current legal situation was very factual, it was very logical," *id.* at 226, and "his answers to [the questions submitted to him] ... were very cogent answers for the most

part," *id.*; *see also id.* at 218. Further, we are quoted with confidence the ultimate colloquy between the trial court and Logan, where the expert was heard to admit that Rumbaugh's decision is "rational based on what he presently faces," *id.* at 245, but we are not quoted what immediately ensued:

A. ... Once again, the man's depression, the fact that he is miserable, let me use the Judge's own words, the fact that he is miserable, that he finds his current situation intolerable certainly influences his decision to decline further appeal.

Q. And that's a mental illness, isn't that correct?

A. Yes.

Q. And that substantially effects [sic] his ...

A. I think the dilemma people are struggling with is that someone can be mentally ill for very realistic reasons.

Q. Absolutely. And the issue before this Court is not whether he's going to receive future treatment or anything; the issue is at the time you examined him and made your diagnosis, he was suffering from a mental illness that substantially effected [sic] his competency to act in the premises, is that correct or not?

A. That's what I said.

*Id.* at 246. The record reveals that every statement suggesting Rumbaugh can rationally digest his own psychological and legal status is emphatically qualified by a subsequent discussion of how—to adopt Dr. Dickerson's phrasing—Rumbaugh's logic almost certainly operates in service of his mental disorder.[8]

---

**8.** There was considerable discussion by each witness as to whether Rumbaugh's depression generated the desire to die—in which case his desire to die would be involuntary—or, alternatively, whether Rumbaugh's awareness of his disease and its incurability produced the suicidal urge—in which case his desire to die would be autonomous. The Kaufman testimony is indicative:

Two things. One, with this mental disorder, that is, when one suffers a major depression ... a major depressive episode, very,

very often part of the illness itself is to become suicidal and to be hopeless.

This is a part of the illness.

In turn, that creates a situation where one is both wanting to kill one's self and feels hopeless about the situation; and yet, one wants treatment for this enormous pain that one is in.

So he would like the help and yet his previous experience is that there is no help available. And so you get into a kind of circular problem where the illness causes him to be severely depressed, hopeless and suicidal.

As *Rees* would have us bridge the synapses, Logan's testimony supports rather than refutes the theory that Rumbaugh is incapable of rationally choosing whether to assert his legal rights. Logan's testimony is consistently buttressed by that of Kaufman and Dickerson, and it is not persuasively contended otherwise by Parker. Moreover, the psychiatric and psychological evaluations themselves speak in unison to the substantial effects of Rumbaugh's illness on his actions and his thoughts—effects which have plagued him for an entire life.

If we must adopt the metaphysics of *Rees*, we must also accept that an individual can espouse a rational view of his situation—in other words, that his decision to die may reflect what to us seems a potentially rational weighing of options—yet the rationality of perception may only cloak a more basic component of mental disease. A blue coat lit yellow seems green, but the garment retains its primary hue.

> His experience with treatment, which I may add, his hopeless and suicidal thoughts and behavior is part of the illness, so it's not realistic in that sense.
>
> It is just … it's part of the illness.
>
> Okay. However, that leads to a kind of circular problem. That is, his experience with treatment leads him to believe there's no hope which is realistic from his point of view; and therefore, in order to get out of his situation, he wishes to die, which is also perhaps realistic.

Record vol. 1, at 81–82. Since *Rees* denotes incompetency upon the mere *possibility* that the individual's mental illness substantially affects his capacity in the premises, the majority's result necessarily presumes that Rumbaugh's disease could not be the source of his suicidal urge. The opinion concludes that "Rumbaugh's disease influences his decision because it is the source of mental pain which contributes to his invitation of death." At 402. Under *Rees*, the majority could only be concluding that Rumbaugh's awareness of his disease and of its incurability—not the disease itself—is what "depresses" him.

Three observations to the contrary, however, can be gleaned from the doctors' testimony and the Springfield reports. First, the distinction between the disease, on the one hand, and Rumbaugh's awareness of it, on the other, is for the most part meaningless. While a decision motivated by the awareness of a disease is arguably more autonomous, and hence more "rational,"

## III

While adhering to the position that the trial court clearly erred in its finding of competency—either by applying the incorrect test or by applying the correct test incorrectly—I also believe that a ruling on a condemned's competency to waive federal collateral relief should not be shielded by the hands-off deference of Fed.R.Civ.P. 52(a).[9] Competency determinations are mixed issues of fact and law. Although the majority pronounces by fiat that the trial court's application of *Rees* is "essentially a factual question," at 399, this characterization is supported by neither reason nor precedent.

The line between questions of fact and questions of law is far from bright. 9 C. Wright and A. Miller, *Federal Practice and Procedure* § 2588, at 752 (1971). Many issues, being neither purely factual nor purely legal, contain elements of both fact and law. This is particularly true of

than one that is the directly compelled by-product of the illness, it ultimately makes little sense to maintain that the awareness exists exclusive of the disease itself. Rumbaugh's awareness presupposes the existence of its object, the disease. Where the awareness and the disease by definition coexist, the disease cannot be dropped from an assessment of motivating forces merely because the afflicted individual is cognizant of its existence.

Second, it is far from clear that *Rees* even contemplates the distinction. If the awareness of a disease affects Rumbaugh's decision to waive appeal, then although the disease may not proximately cause the waiver, the interposition of awareness does not mean that the disease has any less substantial an ultimate effect on Rumbaugh's capacity in the premises.

Finally, the doctors themselves acknowledge that this entire debate poses as much a philosophical as it does a medical dilemma. Whether sages or sutures be best, the absence of a convincing explanation in the record as to the source of Rumbaugh's decision suggests another approach. Where the competency question is close, the risk of nonpersuasion should not cape the shoulders of a potentially incompetent defendant. *See infra* Part IV.

**9.** Rule 52(a) directs in pertinent part that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

certain substantive categorizations. When we affix the label "competent," for example, we do not merely describe the person, we also draw a legal conclusion about him.[10] We do not merely "see" his competency—we both see and interpret.

In the case of "competency" and "rationality," our inquiry is further clouded by the fact that "competency" and "rationality" are relative concepts, significant only with regard to a given environment. As judges, we pronounce that an individual may be competent or rational enough to perform some acts but not others. A defendant's competency to stand trial is gauged at a level different from that of competency to waive a trial right or to commit a proscribed act. *Westbrook v. Arizona,* 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966) (per curiam); *Massey v. Moore,* 348 U.S. 105, 75 S.Ct. 145, 99 L.Ed. 135 (1954). These conceptual differences infuse a proportional mix of fact and law that varies among types of competency determinations and that consequently entails shifting responsibilities as between the trial and appellate courts. As a result, in reviewing a lower court's decision, we cannot simply take a problem, identify it as one of "competency," characterize "competency" as a question of "fact," and chant, "Hokus-pokus, the clearly erroneous standard of review applies." More is required: we must undertake a functional analysis of the underlying issues to determine whether those issues are better resolved at the trial or the appellate level.

For instance, the constitutional standard of competency to stand trial is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reason-

able degree of rational understanding—and whether he has rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 403, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960) (per curiam). As applied by this circuit, the *Dusky* formulation requires that the defendant have "the present mental ability meaningfully to participate in his defense." *Johnson v. Estelle,* 704 F.2d 232, 237 (5th Cir.1983), *cert. denied sub nom. Johnson v. McKaskle,* — U.S. —, 104 S.Ct. 1006, 79 L.Ed.2d 237 (1984). This standard reflects the minimum level of a defendant's potential participation required to preserve his right to a fair trial. Although subject to expert opinion similar to that where competency of any sort is at issue,[11] the determination of competency to stand trial is particularly well-addressed by the trial court, whose first-hand familiarity with the type of participation required of a defendant would not be meaningfully supplemented by intensive scrutiny on appeal. Moreover, the trial court's evaluation of competency is often based in part on discussions with the defendant, *see Woodall v. Foti,* 648 F.2d 268 (5th Cir.1981), and nothing in the competency to stand trial determination necessitates an inquiry into the presence, absence, or effect of a "mental disease, disorder, or defect." *See generally* Pizzi, *Competency to Stand Trial in the Federal Courts: Conceptual and Constitutional Problems,* 45 U.Chi.L.Rev. 21, 37–38, 53–55 (1977). The inquiry is akin to those that, while presenting mixed questions of fact and law, are deemed predominantly factual for purposes of our standard of review. *See, e.g., Connally v. Transcon*

---

**10.** Ostensibly empirical observations may well embody underlying value biases. Consider, for example, the difference between categorizing a violent conflict as a "riot" or a "revolution," or between categorizing a person as a "terrorist" or a "guerilla." *See* Taylor, "Neutrality in Political Science," *in The Philosophy of Social Explanation* 139–70 (A. Ryan ed. 1973).

**11.** Federal law requires the trial court to solicit psychiatric testimony as to a defendant's mental condition whenever competency is raised either by motion of the parties or sua sponte. 18

U.S.C.A. § 4244 (1969); *United States v. McEachern,* 465 F.2d 833, 837 (5th Cir.), *cert. denied,* 409 U.S. 1043, 93 S.Ct. 539, 34 L.Ed.2d 494 (1972). Moreover, the Supreme Court has held that, at least where state law mandates a competency investigation upon reasonable belief that the defendant might be incompetent, the failure to conduct such an inquiry violates the defendant's due process right to a fair trial. *Drope v. Missouri,* 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975); *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).

*Lines,* 583 F.2d 199, 202 (5th Cir.1978); *Backar v. Western States Producing Co.,* 547 F.2d 876, 884 (5th Cir.1977). For all these reasons, we defer to the trial court's expertise in such matters absent clear error. *United States v. Hayes,* 589 F.2d 811, 822–23 (5th Cir.), *cert. denied,* 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979); *United States v. Fratus,* 530 F.2d 644, 647 (5th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 130, 50 L.Ed.2d 118 (1976).[12]

The measure of an individual's competency under *Rees* to waive federal habeas review in a death case is informed by considerations very different from those underlying the standard for competency to stand trial. Focusing not merely on the minimal cognitive and communicative capabilities necessary to stand trial, *Rees* requires a finding of incompetency if there is a *possibility* that a mental disease or defect substantially impairs the individual's rationality. *Cf. United States v. McEachern,* 465 F.2d 833, 836–39 (5th Cir.) (holding that 18 U.S.C. § 4244 mandates inquiry as to competency to stand trial upon mere possibility that defendant is incompetent), *cert. denied,* 409 U.S. 1043, 93 S.Ct. 539, 34 L.Ed.2d 494 (1972), *discussed in United States v. Crosby,* 739 F.2d 1542, 1545–46 (11th Cir.), *cert. denied sub nom. Hirsch v. United States,* —— U.S. ——, 105 S.Ct. 576, 83 L.Ed.2d 515 (1984). The type of "rationality" relevant to waiving review is emphatically not congruous with that required to stand trial. Rumbaugh, for example, undoubtedly possesses faculties sufficient to preserve his right to a fair trial under *Dusky,* but, as the discussion in Part II above indicates, these faculties are not dis-positive of his competency to waive review in the instant case. The particular expertise of a trial court is of limited value where the inquiry is shaped almost exclusively by the reports and conclusions of experts, especially where, as here, the question requires the application of a complex legal standard to the doctors' findings and conclusions. The demeanor of the defendant before the trial court is virtually irrelevant. Rumbaugh's initial refusal to take the stand would have meant complete reliance on expert opinion; to the extent his appearance might have informed the trial court's conclusion, the discussion thus far should indicate the limited value of superficial observation in apprising the effects of Rumbaugh's mental illness. *See supra* Part II. Unlike the question of capacity to participate meaningfully at trial, the question of capacity for rational choice requires a more probing inquiry, where the observer's interpretation is of much greater consequence than his perception. Thus, while both competency to stand trial and competency to waive federal collateral review are mixed questions of fact and law, the former warrants clearly erroneous review by virtue of considerations that are absent in the present case. An inquiry under *Rees* is precisely the kind of mixed question we decide after conducting a de novo review. *See United States v. Fooladi,* 703 F.2d 180, 183 (5th Cir.1983); *Baty v. Balkcom,* 661 F.2d 391, 394 n. 7 (5th Cir. 1981), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982); *Washington v. Watkins,* 655 F.2d 1346, 1351–54 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982); *Ameri-*

---

12. *Fratus,* cited by majority as sole authority for applying clearly erroneous review in this case, involved a competency to stand trial determination. The proper standard of appellate review of a trial court ruling under *Rees* is an issue of first impression in this and every other circuit. While the majority seems to recognize the novelty, one can only wonder at the statement,

. We find no reported case applying the *Rees* standard to a defendant's decision to forgo further appeals and collateral proceedings which decides *how a court should treat* a mental disease which ... impacts only on ... the person's ability to make a rational choice among available options. We must now address that issue. We find it essentially to be a *factual* question.

At 399 (emphasis added) (footnote omitted). Facts inevitably inform the resolution of legal rules, but the convergence of fact and law does not magically convert a question of law into one of fact. The question of "how a court should treat a mental disease" could as well inquire as to "the legal effect of a mental disease." Because the issue requires us primarily to engraft a legal norm onto a factual predicate—rather than to ask whether a trial court's findings are arguably correct—the essence of fact eludes me.

can *National Bank of Austin v. United States,* 421 F.2d 442, 451 (5th Cir.), *cert. denied,* 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970); *Morris v. Beto,* 376 F.2d 845, 846 (5th Cir.1967) (per curiam).

While Supreme Court precedent furnishes little direct guidance, the cases that have addressed similar attempts to waive federal habeas review strongly suggest an appellate function more meaningful than the majority's. In *Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976), the Court carefully examined the materials relevant to the defendant's competency and convinced itself that the waiver was knowingly and intelligently made.[13] *Id.* at 1013, 97 S.Ct. at 437; *see id.* at 1014–16 & nn. 3–5, 97 S.Ct. at 437–39 & nn. 3–5 (Burger, C.J., concurring); *id.* at 1017, 97 S.Ct. at 439 (Stevens, J., concurring); *see also Lenhard v. Wolff,* 444 U.S. 807, 811 n. 2, 100 S.Ct. 29, 30 n. 2, 62 L.Ed.2d 20 (1979) (Marshall, J., dissenting from denial of stay). Far from relying on the factfinding and conclusions of the trial judge, the Court scrutinized anew the entire record. Similarly, the Court in *Rees* stated, "Whether or not Rees shall be allowed … to withdraw his certiorari petition is a question which it is ultimately the responsibility of this Court to determine, in the resolution of which Rees' mental competence is of prime importance." 384 U.S. at 313, 86 S.Ct. at 1506. Thus, the Court retained jurisdiction upon remand to the district court for findings of fact—a procedural oddity which reserved to the Court itself the task of applying its standard to the facts as found below.[14] Our function as an intermediate court of appeal should be no less than what the Supreme Court has seen fit to impose on itself when considering a condemned's attempt to solicit his sentence.

The legal characterization of an individual's mental state under *Rees* is parasitic on the factual conclusions rendered by those testifying on the issue. The effect of Rumbaugh's mental disorder on his free will—the disease's hold over an apparently rational discourse—can be perceived by the district judge as trier of fact only through the pince-nez of the experts. Issues of credibility are at a minimum in this kind of determination, and where demeanor does surface as relevant, the trial judge should state so expressly. Fed.R.Civ.P. 52(a). But absent such findings—which themselves would be revocable on review only if clearly erroneous—an appellate panel is as well-suited as the trial court to applying de novo the legal standard of competency to ultimate facts. *Baker v. Metcalfe,* 633 F.2d 1198, 1201 (5th Cir.), *cert. denied,* 451 U.S. 974, 101 S.Ct. 2055, 68 L.Ed.2d 354 (1981). We are faced not with conflicting testimony whose resolution can benefit from the factfinding expertise of a district court, but rather with evidence whose contradictions, if any, surface only at the level of legal conclusion. "[I]t is well settled that the clearly erroneous limitation does not apply to the review of a district court's legal conclusions and inferences drawn from the facts, and that the appellate court is free to make an independent determination from the same facts of the determinative legal conclusions and inferences." *United States v. Grayson County State Bank,* 656 F.2d 1070, 1075 (5th Cir.1981) (*citing United States v. Mississippi Valley Generating Co.,* 364 U.S. 520, 526, 81 S.Ct. 294, 297, 5 L.Ed.2d 268 (1961); *Spray-Bilt, Inc. v. Ingersoll-Rand World Trade, Ltd.,*

---

**13.** I must assume, as must the majority, that *Gilmore*'s use of the "knowing and intelligent" formulation, *see Johnson v. Zerbst,* 304 U.S. 458, 464, 465, 58 S.Ct. 1019, 1023, 1023, 82 L.Ed. 1461 (1938), did not jettison the *Rees* standard. Because any knowing and intelligent waiver presupposes competency, the competency determination must in any event be made under the appropriate standard. *Gilmore* does not speak to the substance of this inquiry.

**14.** *See also Anderson v. Kentucky,* 376 U.S. 940, 84 S.Ct. 795, 11 L.Ed.2d 766 (1964) (continuing case indefinitely upon joint stipulation of the parties). That the issue of Rees's competency arose on a motion to withdraw his petition for certiorari does not distinguish that case from ours. The Court's disposition is significant for its allocation of responsibility between the trial and appellate tribunals, not for its place on the Court's discretionary docket. *Cf. Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam).

350 F.2d 99, 103 (5th Cir.1965); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2588, at 570, § 2589, at 753 (1971)), *cert. denied sub nom. First Pentecostal Church v. United States*, 455 U.S. 920, 102 S.Ct. 1276, 71 L.Ed.2d 460 (1982). These are the decisions we have been hired to make.

### IV

Few cases can be decided with absolute certainty. For that reason, the presumptions we apply to resolve uncertainty often go far toward determining the outcome of a case. By placing the burden of proof on one party or the other, we establish a threshold, below which uncertainty is resolved against the party on whom the burden is imposed.

While I believe the record in this case indisputably shows that Rumbaugh is incompetent under *Rees* to choose what he has chosen, this mixed question of fact, law, and philosophy inevitably contains elements over which reasonable, arguably rational judicial minds could differ. The effect of the majority's decision, however, is anything but unclear: it condemns Rumbaugh to certain death. If Rumbaugh's interest in preventing the imposition of the death penalty—an interest that he seeks to waive—were the only interest at stake, it might be appropriate to resolve uncertainties in favor of respecting his choice. In capital cases, however, the defendant's is not the only interest at stake—the state as well has an interest in ensuring that the death penalty is not imposed unconstitutionally. When this irrevocable measure is improperly invoked, not only the individual but society as a whole suffers.

Although we do not strive for procedural perfection in cases involving the death penalty, *Pulley v. Harris*, —— U.S. ——, 104 S.Ct. 871, 881, 79 L.Ed.2d 29 (1984); *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (plurality opinion), our jurisprudence does recognize a constitutional basis for procedurally minimizing the arbitrariness and caprice that can pollute the decision whether to execute. *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983); *Eddings v. Oklahoma*, 455 U.S. 104, 110–12, 102 S.Ct. 869, 874–876, 71 L.Ed.2d 1 (1982); *id.* at 118–19, 102 S.Ct. at 878–79 (O'Connor, J., concurring); *Beck v. Alabama*, 447 U.S. 625, 637–38 & n. 13, 100 S.Ct. 2382, 2389–90 & n. 13, 65 L.Ed.2d 392 (1980); *Green v. Georgia*, 442 U.S. 95, 97, 99 S.Ct. 2150, 2151, 60 L.Ed.2d 738 (1979); *Lockett*, 438 U.S. at 604, 98 S.Ct. at 2964; *Gardner v. Florida*, 430 U.S. 349, 358–59, 97 S.Ct. 1197, 1204–05, 51 L.Ed.2d 393 (1977) (plurality opinion); *id.* at 363–64, 97 S.Ct. at 1207–08 (White, J., concurring); *Woodson v. North Carolina*, 428 U.S. 280, 304–05, 96 S.Ct. 2978, 2991–92, 49 L.Ed.2d 944 (1976) (plurality opinion). I believe that, given the state interest in imposing the death penalty only in accordance with the Constitution, the uncertainty inhering in any competency determination should be resolved in favor of allowing federal collateral review of the defendant's conviction and sentence. An otherwise qualified next-friend petitioner should not bear the burden of proving the defendant's incompetency under *Rees*.[15] I look to the Shakespea-

---

15. Generally, a person lacks standing to obtain federal habeas corpus review on behalf of another unless he can show (1) a reasonable excuse as to why the detainee did not sign and verify the habeas petition, and (2) a sufficient relationship and interest linking the would-be "next friend" to the detainee. *Rumbaugh ex rel. Rumbaugh v. McKaskle*, 730 F.2d 291, 293 (5th Cir.1984); *Weber ex rel. Zimmerman v. Garza*, 570 F.2d 511, 513–14 (5th Cir.1978); *see* 28 U.S.C.A. § 2242 (West 1971) (providing in part that an "[a]pplication for a writ of habeas corpus shall be in writing signed and verified by the person for whose relief it is intended or by someone acting in his behalf.").

Burdening the next-friend petitioner with the task of showing incompetency under *Rees* overlooks not only the practical difficulties of performing the task but also the role of the federal judiciary in exercising its habeas corpus jurisdiction. The federal courts almost certainly lack jurisdiction to issue writs of habeas corpus absent congressional authorization, *see Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1868); *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 94–95, 2 L.Ed. 554 (1807); *see also United States v. MacCollom*, 426 U.S. 317, 322–23, 96 S.Ct.

rean theme of "to be or not to be" and receive no guidance therefrom, but we may often have more guidance in the Bard's analysis of Hamlet's problem than we have in deciding whether a defendant is competent to make decisions such as Rumbaugh's. Before casting these individuals voluntarily down the corridor of death, we should require no less than convincing proof that they have the capacity to invite the journey.

To assume competency is to let the enigmas of psychology breathe our miasmic decree. While it is clear that expert opinion is a relevant and allowable evidentiary component of mental capacity determinations even in capital cases, *Barefoot v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), the standards of proof under which such evidence should be weighed presents a distinct issue. There are I am sure psychiatric conclusions replete with the hallmarks of demonstrative truisms, but too often cases reveal expert medical opinion devoid of convincing force, vigor, and strength. If a next-friend proposes to convince us why a defendant was unconstitutionally condemned, the defendant should be rebuttably presumed incompetent for purposes of conferring standing on the next-friend petitioner. The decision to hasten one's state-imposed death is sufficient to raise such a presumption. *Cf. Massie v. Sumner*, 624 F.2d 72 (9th Cir. 1980), *cert. denied*, 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 828 (1981); *People v. Stanworth*, 71 Cal.2d 820, 80 Cal.Rptr. 49, 457 P.2d 889 (1969); *Commonwealth v. McKenna*, 476 Pa. 428, 383 A.2d 174 (1978). Where fundamental fairness counsels otherwise, we should not be bound, as was the court below, by the formalistic notion that

a next-friend petitioner need show his standing. *See generally* 10 J. Moore, *Moore's Federal Practice* § 301.02 (2d ed. 1982).

The issue before us is not unlike where the validity of a defendant's waiver is scrutinized as a matter of federal constitutional law. Just as it is "incumbent upon the State to prove 'an intentional relinquishment or abandonment of a known right or privilege,'" *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977) (*quoting Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)), so too should the state carry the burden of proof on a defendant's competency to waive federal collateral review. It is of no consequence that a condemned's "waiver" is cast in the more stringent terms of competency under *Rees* when presented by next-friend petition. The Constitution governs by substance, not form.

The troubled life of Charles Rumbaugh presents an abundance of moral questions that people of thought have debated without satisfactory resolve since antiquity. If it invites hubris to dictate death, on this we cannot pass. But we must at least acknowledge in ourselves the inability to understand in full the workings of the human mind. Where we must pretend to such capacity, however, we should grant ourselves and those who suffer most from our mistakes the benefit of an admittedly grave doubt. To look askance when a next-friend could tell us how a condemned's conviction or sentence falls outside the precious safeguards of the Constitution is to place the burdens of our own flawed

2086, 2090–91, 48 L.Ed. 666 (1976) (plurality opinion), and the Supreme Court has never squarely faced whether Congress or the states are constitutionally obligated under art. 1, § 9, cl. 2, to provide a post-conviction judicial forum for the adjudication of federal claims, *see generally Developments in the Law—Federal Habeas Corpus*, 83 Harv.L.Rev. 1038, 1266–74 (1970). But where Congress has afforded the basis on which to grant the Great Writ to next-friend petitioners, the federal courts have only limited discretion to deny habeas corpus review—at

least where "such review is available for claims of 'disregard of the constitutional rights of the accused, and where the writ is the only effective means of preserving his rights.'" *Wainwright v. Sykes*, 433 U.S. 72, 79, 97 S.Ct. 2497, 2502, 53 L.Ed.2d 594 (1977) (*quoting Waley v. Johnston*, 316 U.S. 101, 104–05, 62 S.Ct. 964, 965–66, 86 L.Ed. 1302 (1942)). *See Fay v. Noia*, 372 U.S. 391, 438–39, 83 S.Ct. 822, 848–49, 9 L.Ed.2d 837 (1963); *Brown v. Allen*, 344 U.S. 443, 460–61, 73 S.Ct. 397, 408–09, 97 L.Ed. 469 (1953).

knowledge on the one we choose to kill. The failure to rise to this self-appointed level of responsibility is resplendent with neither truth nor justice. It seems, unfortunately, to be the American way.