Michael Wayne **EGGERS**, Petitioner,

v.

**STATE of Alabama, Respondent.**

**2:13-cv-1460-LSC**

United States District Court,
N.D. Alabama, Southern Division.

Signed September 21, 2016

---

Christine A. Freeman, Leslie Smith, Federal Defenders, Middle District of Ala-

bama, John Palombi, Federal Defenders Program Inc., Montgomery, AL, for Petitioner.

Richard D. Anderson, Office of the Attorney General, Montgomery, AL, for Respondent.

## MEMORANDUM OF OPINION AND ORDER

L. Scott Coogler, United States District Judge

### I. Introduction

Petitioner Michael Wayne Eggers ("Eggers") is an Alabama death row inmate who has filed recurrent requests to withdraw his appeal of this Court's denial of his 28 U.S.C. § 2254 habeas petition, discharge his appointed counsel, and be executed. After examining the entire record in this action, this Court is of the opinion that Eggers's requests are due to be granted.

### II. Procedural History [1]

Eggers originally permitted his appointed counsel, John Palombi and Leslie Smith of the Middle District of Alabama Federal Defenders Office, to litigate his § 2254 petition in this Court. However, throughout the course of these proceedings he has repeatedly expressed disagreement with appointed counsel's litigation strategy, sought to have different counsel appointed, and asserted claims for habeas relief in his own numerous and voluminous *pro se* filings. He has also at times indicated his desire to abandon his habeas petition and waive all appeals, but his requests to do so were noncommittal and ambiguous. This Court refused to appoint new counsel for Eggers but allowed him to file a *pro se* amended petition for habeas relief in addi-

---

1. This section details recent events pertinent to Eggers's requests to withdraw his appeal. The Court's Memorandum of Opinion denying Eggers's § 2254 petition (doc. 134) offers a more comprehensive procedural history of Eggers's trial, conviction, direct appeal, state postconviction proceedings, and federal habeas corpus proceedings.

tion to the petition submitted by appointed counsel. On November 25, 2015, this Court denied the petitions and dismissed the action. (Docs. 134 & 135.) On December 22, 2015, Eggers filed a *pro se* "Motion to Appoint Successor Counsel Who Shall Effectively Waive All [His] Appeals," in which he asked to be allowed to "move forward with his state sanctioned execution without any further undue delays." (Doc. 136.) On December 23, 2015, Eggers's appointed counsel filed a motion for reconsideration of the Memorandum of Opinion and Order denying the petition (doc. 137), which the Court granted in part and denied in part on January 8, 2016 (doc. 138). On January 11, 2016, Eggers filed a *pro se* "Motion for a Final Order" in which he asked this Court to furnish him a copy of its final order so that he could send it to the Alabama Supreme Court "to expedite [his] execution." (Doc. 139.) Eggers also contemporaneously filed a *pro se* "Waiver/Notification/Motion to Expedite Execution" in the Alabama Supreme Court. Respondent (hereinafter "the State") responded to that pleading in the Alabama Supreme Court on January 29, 2016, stating that it "had no objection to his waiver of future state [or, presumably, federal] court appeals."

In light of Eggers's *pro se* requests to discharge counsel and waive all further appeals, on February 1, 2016, Eggers's appointed counsel filed a motion to extend the deadline to file a notice of appeal on Eggers's behalf and requested a hearing on Eggers's competence to waive appeals (doc. 140), which the Court granted (doc. 141). Thereafter, Eggers's appointed counsel filed a protective notice of appeal with the Eleventh Circuit Court of Appeals, explaining that Eggers's competency to waive further appeals is currently being litigated in this Court and could not be resolved by the extended appeal deadline. (Doc. 144.) The Eleventh Circuit remanded the action to this Court for the limited purpose of conducting the competency hearing. (Doc. 154.)

On April 8, 2016, this Court held an evidentiary hearing to determine whether Eggers is mentally competent to make the decision to forego further collateral review, dismiss his attorneys, and be executed. At the hearing, the Court heard from Dr. Ken Benedict, a psychologist retained by appointed counsel, Dr. Glen King, a psychologist retained by the State, and from Eggers himself. The Court also admitted into evidence, among other things, Eggers's Alabama Department of Corrections ("ADOC") file, Dr. Benedict's psychological evaluation report dated October 17, 2014, and Dr. King's psychological evaluation report dated April 5, 2016.

In the weeks after the hearing, the Court received briefs from appointed counsel, the State, and Eggers. Appointed counsel's brief argued that Eggers is not competent to waive his appeal or undertake self-representation because he suffers from psychotic delusions and requested that the Court appoint a person as next friend to prosecute the appeal in Eggers's stead. (Doc. 156.) Before the State's brief was due, Eggers filed two *pro se* pleadings: a "Pro Se Response to Competency Hearing and Brief in Support Submitted by A/C and State" (doc. 157) as well as a "Summary Argument to Eggers Response to Competency Hearing, Appointed Counsel and State of Alabama" (doc. 158). In these pleadings, Eggers argued that he is competent, that he should be allowed to discharge his appointed counsel and proceed *pro se*, and that he should be allowed to waive all appeals and proceed immediately to execution. However, he also indicated dissatisfaction with the Court's treatment and ultimate denial of the claims for relief in support of his § 2254 petition that he had asserted in a *pro se* capacity. His pleadings led the Court, in an abundance

of caution, to order Eggers to file a pleading indicating whether (1) he would desire to appeal any of the grounds for habeas relief that he asserted in a *pro se* capacity, or any other grounds, if the Court should allow him to discharge appointed counsel and appeal *pro se*, or (2) he truly wished to withdraw and waive all future appeals in their entirety. (Doc. 160.) In his May 5, 2016, response, Eggers stated that he "simply withdraws and waives all future appeals in their entirety." (Doc. 161.) The State subsequently filed its brief arguing that Eggers is competent to waive all appeals and discharge his counsel because he is not suffering from a severe mental illness, is aware of all of the options available to him, and has made a rational choice among them. (Doc. 162.) Since then, Eggers has filed several pleadings indicating that he is anxious for the Court to rule on his request to withdraw his appeal. (Docs. 163,165,169, and 171.)[2]

### III. The Psychological Evaluation Reports and the Testimony Elicited at the Competency Hearing[3]

#### A. Dr. Benedict

Dr. Benedict was first retained by Eggers's appointed counsel in 2014, in support of a motion asking the Court to declare Eggers incompetent to proceed in this action or to conduct a competency hearing. (Doc. 44.) Appointed counsel argued at the time that Eggers's numerous *pro se* filings raised questions about his ability to make rational decisions about his case. In support, they offered Dr. Benedict's October 17, 2014, psychological eval-

uation report of Eggers, in which he described, among other things, the results of four separate interviews he conducted with Eggers at Donaldson Correctional Facility on May 22 and 23, 2014, and August 28 and 29, 2014. However, the Court denied counsel's motion for a competency hearing, acknowledging that if a death penalty petitioner whose competency is in question wishes *to dismiss his § 2254 petition in its entirety*, the Court must first ensure that the petitioner is competent to make that decision, but finding that because Eggers had filed pleadings indicating that he did *not* wish to abandon his federal habeas petition but instead wished to proceed *pro se* or with different counsel, a competency hearing was not required at that time. (Doc. 46.) Although Dr. Benedict met with Eggers again in February 2016 in preparation for the April 2016 competency hearing, Dr. Benedict did not amend or update his 2014 report, and it was thus the 2014 report that was admitted into evidence at the competency hearing.

Dr. Benedict has testified in criminal cases as an expert in psychology about fifteen times, the large majority of those having been death penalty cases. Of those, he has always testified on behalf of an appellant or petitioner. Dr. Benedict estimates he spent about twenty-one hours with Eggers during his interviews. To prepare the report he submitted to Eggers's appointed counsel dated October 17, 2014, he reviewed Eggers's ADOC records, social histories provided by Eggers, prior evaluation data, the indictment and some trial testimony, and *pro se* filings submit-

---

2. The Clerk is hereby **DIRECTED** to terminate Documents 165 ("Motion for Ruling") and 171 ("Motion for Court to Incorporate a Cease and Desist Order Directed to A/C Within the Court's Opinion Upon the Issue of Eggers' Competency Issue") as **MOOT**.

3. The record before the Court is the entire record on federal habeas review in this ac-

tion. However, this section sets out and comments upon only the parts of the record that the Court deems relevant to the issue to be decided, i.e., whether Eggers is *currently* competent to waive his appeal, dismiss his attorneys, and proceed to execution. The Court has taken the entire record into consideration, however, in making its determination.

ted by Eggers. Prior to appearing at the competency hearing in April 2016, Dr. Benedict also reviewed updated correctional records, *pro se* filings from Eggers, and a copy of Dr. King's evaluation of Eggers.

The following are some of the documents reviewed by Dr. Benedict and his discussion of them in his report:

- A January 23, 1987 complaint by the El Paso, Texas Police Department referring to Eggers and his brother, who had reported being followed by unknown subjects. The report stated that "both subjects do not appear to be mentally stable." Dr. Benedict noted that this incident resulted in the police taking Eggers to the Thomason General Hospital's psychiatric ward on an emergency hold but that records from this admission have been reportedly destroyed.

- The January 11, 2001 transcript of Eggers's confession, in which he explained that he killed the victim because "I felt like everybody was on the fuck you bandwagon. I don't know. I don't know. That's the way I'm putting it but that's the only way I can think of saying it like everybody was on the fuck Mike bandwagon."

- Records from the Walker County, Alabama jail while Eggers was awaiting trial. On April 14, 2001, Eggers filed a medical visit request stating "lack of concentration, suffering anxiety attacks, panic attacks, mind keeps racing on punishment 'electric chair,' still not sleeping well, worried about family, kids." On April 25, 2001, he filed another medical visit request stating, "I'm losing control of my mind." On November 17, 2001, Eggers filed another stating "anxiety is high, mind is racing, restless sleep, cannot concentrate on a focused subject, irritable, medication does not seem to be working." Dr. Benedict noted that in response to this

last report, the physician ordered an increase in Elavil, an antidepressant, to 100 mg. before bedtime. On September 15, 2002, jail personnel quoted Eggers as stating "still suffering from major anxiety, trouble focusing on fixed objects, such as concentration, previous meds are not working like they were before! Feel like I'm harnessing rage." Dr. Benedict noted that in response to this report, the physician ordered an increase in Klonopin, an anxiolytic, to 2 mg. twice daily.

- Two mental health evaluations conducted during the course of Eggers's trial, by Dr. Alan Shealy and Dr. James Hooper, as well as the trial testimony of these individuals. Dr. Benedict noted that Dr. Shealy's August 26, 2002 psychological evaluation resulted in diagnoses of intermittent explosive disorder and paranoid personality disorder. Dr. Shealy interviewed Eggers and two family members and administered a Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") and part of an IQ test. Dr. Hooper's psychiatric examination occurred on August 27, 2002, from which he concluded that Eggers "does not suffer, nor has he ever suffered, from a severe mental disease or defect."

- ADOC records stating that from October 2002 to May 2004, Eggers was treated with Risperdal, Vistaril, Klonopin, and Prozac.

- State of Alabama Board of Corrections Institutional Incident Reports. On November 23, 2002, Eggers was written up for running down the hall threatening inmates with racial epithets and later threw a tray of food on the floor while cursing at inmates. On November 28, 2002, an officer reported that Eggers was hearing voices and wanted

to cut himself, and that he subsequently made two cuts on his wrist. This incident resulted in him being placed in a stripped cell. On December 12, 2002, Eggers told a mental health provider at ADOC that he had been "hallucinating voices for 18 years." On January 5, 2003, it was reported that Eggers stopped a commanding officer and stated that he was having thoughts that everyone was trying to kill him. Follow-up with mental health on that same day resulted in observations including "makes little sense; tense; weird; and pacing." According to Dr. Benedict, these reports suggest "significant deterioration in mental health while in prison."

- Three hand-written complaints that Eggers filed with the ADOC Commissioner and to the Warden of the Donaldson Correctional Facility in April and May 2014, in which Eggers discusses concerns that his food is unsanitary and that prison staff may be delaying the delivery of his mail, and makes other general references to prison staff's tolerance if not encouragement of inmate misconduct. According to Dr. Benedict, these reports indicate that Eggers is having "serious adjustment difficulties in prison."

Between the May and August 2014 contact visits Dr. Benedict also conducted telephonic interviews with several of Eggers's family members and childhood and adulthood friends. As Dr. Benedict described in his report, several of these individuals discussed Eggers having "paranoid tendencies" beginning around 1985, when federal officers forced Eggers to become a confidential informant for the San Bernardino, California Sheriff's Office. These family members and friends often described Eggers as speaking about the Monks Motorcycle Club and the Mexican mafia being after him. They also noted that Eggers's brother, David, suffers from paranoid schizophrenia but most said that Eggers's problems were not as severe as his brother's. In May 2014, appointed counsel also obtained a declaration by Eggers's ex-wife, Nikkii Eggers Duffy, which Dr. Benedict reviewed and described as providing "anecdotes highly suggestive of delusional ideation and hallucinatory activity on the part of Mr. Eggers."

Dr. Benedict's report also described his observations concerning Eggers's mental state during the four visits. At the fourth visit, they were joined by Leslie Smith, Eggers's appointed counsel, so that Dr. Benedict could observe their interactions. At that time, Ms. Smith agreed to show Eggers his ex-wife's declaration, which had been a point of contention between them because his attorneys had previously refused to provide it to him. Dr. Benedict testified that Eggers's relationship with his attorneys "waxed and waned a bit," and that his relationship with one is better than it is with the other. [Hearing Transcript (hereinafter "Tr.") at 65.]

During his visits with Eggers in 2014, Dr. Benedict administered several tests that he described as personality tests: the Personality Assessment Inventory, or PAI, the MMPI-2, and the Rorschach inkblot test. Dr. Benedict described the PAI as yielding a profile of an individual's emotional, social, and behavioral functioning based on answers to hundreds of questions, and he stated that it indicated that Eggers suffered from "extremely high levels of clinical paranoia and persecutory ideas." [*Id.* at 28.] According to Dr. Benedict, the results of the MMPI-2 also showed "very high levels of paranoia at levels similar to what was indicated by the PAI." [*Id.* at 30.] Finally, although Dr. Benedict also administered the Rorschach ink blot test, he acknowledged that it has been critiqued as unreliable. However, he chose to administer it as well in order to

collect more information about Eggers's thought processes. Dr. Benedict did not test Eggers when he met with him again in February 2016.

Dr. Benedict's formal diagnosis was that Eggers suffers from a psychotic spectrum disorder, namely schizophrenia, and possibly a delusional disorder, as well as a narcissistic personality disorder and a history of alcohol and drug abuse/dependence in remission. Dr. Benedict explained that psychotic spectrum disorder is listed in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, or DSM-V, as including the following diagnostic criteria: "hallucinations, delusions, disorganized thinking, catatonic behavior or grossly disorganized behavior ... and negative symptoms, which are less obvious symptoms but include things such as interpersonal withdrawal, blunting of emotional expression and the like." [*Id.* at 36.] He further stated that "[o]f those five cardinal symptoms, two must be present for a period of at least six months." [*Id.*] Dr. Benedict opined that Eggers's "most obvious and consistent [symptom of psychosis] is the delusional activity that has been in evidence for many years." [*Id.* at 37.] Dr. Benedict defined delusions by the DSM-V definition, or "falsely-held beliefs that persist in the presence of evidence to the contrary." [*Id.*] He also stated that Eggers suffers from "brief episodes of disorganized thinking" and has a "variety of negative symptoms, including interpersonal withdrawal." [*Id.*]

As examples of delusional activity, Dr. Benedict cited Eggers's beliefs that this Court is engaging in *ex parte* communications with the Supreme Court about his case; that his appointed counsel is withholding information from him and colluding with law enforcement to conceal evidence; that conspirators within the prison are tampering with his food; and that his confession to law enforcement at the time of the murder of the victim was false because an agent of the Federal Bureau of Investigation ("FBI") with knowledge of his prior involvement as a confidential informant in California in the 1980s coerced him into confessing. Although Eggers denied having hallucinations to Dr. Benedict, the psychologist stated that Eggers's own past assertions to correctional officers as well as accounts from Eggers's family members show otherwise. Dr. Benedict testified that he does not agree with Dr. King's diagnosis that Eggers does not suffer from a severe mental disease or defect because Dr. King's opinion was based solely on Eggers's statements and not on collateral interviews. While Dr. Benedict stated that he believes that Eggers does understand that if he drops his appeals he will potentially face execution, he also stated that he believes that Eggers's decision to withdraw his appeal is irrational because it is based on his belief that there is no possible way to "get a fair shake" within the justice system:

I think that at the root of Mr. Eggers' decision to waive his appeals is the fact that he believes that there is no possible way to get a fair shake, if you will. He believes there is corruption at every level of the court system he has been involved with, with the correctional facilities in which he has been housed, and collaboration and conspiracy between various federal and state agencies.

So, to the extent that Mr. Eggers is waiving his appeals based on the fact that he erroneously believes there is no way that he can get a fair hearing, I conclude that he is making that decision irrationally.

[*Id.* at 46.]

On cross examination by the State at the hearing, Dr. Benedict admitted that Eggers had never been diagnosed with any mental illness at all prior to his trial,

but discussed the anecdotal accounts of the incident in 1987 in El Paso, Texas, where Eggers and his brother were arrested after driving erratically and Eggers was in a psychiatric hospital for several days. He admitted that there is no record of that incident, and he admitted that Eggers's contemporaneous methamphetamine use could have contributed to the mental instability described in the arrest records. Dr. Benedict also admitted that in the roughly ten-year period from 1987 until the time of trial, Eggers had no contact whatsoever with mental health authorities. He acknowledged that neither of the two mental health evaluators at Eggers's 2002 trial, Dr. Shealy, who was retained by Eggers's defense counsel, and Dr. Hooper, the prosecution's trial expert, diagnosed Eggers as psychotic or schizophrenic. Instead, Dr. Shealy's diagnosis was paranoid personality disorder and intermittent explosive disorder, and Dr. Hooper's was antisocial personality disorder. Dr. Benedict had described paranoid personality disorder in his report as involving "chronic suspiciousness" but not the delusions or hallucinations that distort reality experienced by those who suffer from schizophrenia.

Dr. Benedict had stated in his report that his diagnosis of schizophrenia was corroborated by the fact that ADOC psychiatric professionals diagnosed Eggers with psychosis in the years following Eggers's trial. However, he admitted on cross examination that those correctional officers later concluded that Eggers was malingering in the early 2000s. He also acknowledged that he had seen and considered ADOC medical records in October 2003 that indicated that Eggers admitted that he feigned symptoms in an attempt to get off of death row. He also acknowledged the existence of correctional records from 2005 where Eggers was described by mental health evaluators as "alert, calm, cooperative, good responses, he is coherent, no symptoms of anxiety,

depression, mania, or psychosis." [*Id.* at 56.] Dr. Benedict was also asked about correctional records from 2007 describing Eggers as normal in affect and thinking, from 2008 describing him as normal and calm and not corroborating psychotic or schizophrenic symptoms or delusions, and from 2009 describing him as calm, cooperative, normal in speech and thoughts, and oriented as to time, place, and person. Dr. Benedict did not recall those records but he did not deny that such records existed. When presented with a 2014 report submitted by a psychologist at Donaldson Correctional Facility, a Dr. D. Tytell, in which she assessed Eggers as stable and noted that he denied having any problems, Dr. Benedict stated that he had no reason to doubt that diagnosis.

Dr. Benedict further admitted on cross examination that Eggers was in fact a confidential informant in the 1980s and acknowledged that confidential informants do place themselves in danger by giving information to the State. He also admitted that there was at least one instance where Eggers's appointed counsel had not provided him with the information he requested: a copy of his ex-wife's declaration, and he thus admitted that Eggers's belief that his attorneys were not providing him with documents was not entirely unfounded. He admitted that Eggers never told him that he wanted to fire his attorneys because they are agents of the Mexican mafia or the Monks Motorcycle Club.

The Court allowed Eggers to personally question Dr. Benedict. The following is some of the testimony elicited during Eggers's lengthy cross examination of Dr. Benedict. In response to Dr. Benedict's testimony that he believes that Eggers experiences delusions, Eggers denied that he is delusional, and he stated that he chooses to isolate himself from other inmates because he feels that isolation is the

optimum environment for artistic creativity and because he tries to stay away from trouble inside the prison. In response to Dr. Benedict's opinion that it is not rational for Eggers to believe that this Court is engaging in *ex parte* communications with the Supreme Court relative to his case, Eggers explained why he feels that way. He stated that that he filed a petition for a writ of mandamus against this Court in October 2015, and despite the fact that Rule 14 of the United States Supreme Court Rules mandates that the clerk should immediately examine and docket such a petition, or return it to the petitioner if corrections need to be made, he did not receive a response from the Supreme Court until March 24, 2016. He acknowledged that the petition was returned to him because he did not provide an *in forma pauperis* application in the proper format and because he did not attach the judgment, but he stated that he believes that the high court purposefully delayed returning his petition to him for corrections in order to allow time for this Court to dismiss his habeas petition. During his cross examination of Dr. Benedict, Eggers also reiterated his belief that there is a connection of sorts between the fact that the FBI was involved in him becoming a confidential informant in 1985 in California and the fact that the FBI was involved in the investigation of the murder for which he was apprehended in 2001. He also repeated a claim he has made before that the FBI withheld records for his trial in 2001.

Eggers also asked Dr. Benedict what he meant when he said that Eggers felt that he wasn't getting a "fair shake" with the department of corrections and the justice system, to which Dr. Benedict stated that Eggers had made various complaints about inmates and correctional officers tampering with his food. Eggers then explained that in 2002, officers at Holman Correctional Facility opened the door to his cell, facilitating an assault on him by a gang of inmates that he believed were in the Mexican mafia. He also mentioned that in 2010 eight African-American gang members came into his cell and attempted to assault him but he escaped unharmed. He further discussed that in 2011 he filed complaints against prison officials after they removed his access to legal materials, and then, because prison officials told other inmates that he was a snitch, he suffered retaliation from inmates, including verbal assaults and threats to tamper with his food. He also discussed the fact that he was prescribed certain medications after the assaults but did not like taking them because they caused him to sleep sixteen to eighteen hours a day and prevented him from attending to his legal affairs. He explained to the Court that he was trying to show through his testimony and questioning of Dr. Benedict that while he was suffering from psychological problems at the time of his offense, he is no longer suffering from them, and that he is not delusional and understands the claims he attempted to raise on federal habeas review.

### B. Dr. King

Dr. King, retained in this matter by the State, has testified in approximately eighty post-conviction matters in death penalty cases or serious criminal cases. While he has always been retained by the State in such proceedings, he ultimately testified in favor of the petitioner in ten of those cases. Dr. King met with Eggers at Donaldson Correctional Facility for approximately two and a half hours on April 4, 2016. Prior to his interview he reviewed Dr. Benedict's report and the data he collected and Eggers's ADOC records. At that time he administered to Eggers a test called the Evaluation for Competency to Stand Trial, Revised Form, or ECST-R. He chose that test because he felt it was the most appropriate to help him an-

swer the question that necessitated the competency hearing; i.e., whether or not Eggers has a serious mental illness or mental defect and whether that illness or defect affects his ability to make rational decisions about his case and consult with his lawyers. Dr. King described the ECST-R as a structured interview having three parts: the first dealing with competency to consult with counsel, the second with factual understanding of courtroom procedures, and the third with rational understanding of courtroom procedures. According to Dr. King, Eggers scored zeros on everything, meaning that "he had a perfect understanding of all the roles of participants, the factual understanding of courtroom procedure, and his ability to consult with counsel." [*Id.* at 121.] Dr. King's conclusion from the results of the test, his interview with Eggers, and the documents he reviewed, was that Eggers "does not have a serious mental illness or mental defect and that he certainly is able to proceed *pro se*. And he has a rational understanding of courtroom procedures, the issues in the courtroom, and that he has a rational and reasonable understanding of what it means to consult with counsel." [*Id.* at 119.] Although Dr. King brought two other tests with him when he met with Eggers, an MMPI-2 and a test for malingering, he didn't feel it necessary to administer them because "[w]hen I first met Mr. Eggers and went through approximately a two-hour interview with him, there was absolutely no evidence for any psychological difficulty, no evidence for mental illness that I could see. He answered all my questions directly, and he also showed no evidence whatsoever for malingering." [*Id.* at 121.] For example, Dr. King stated in his report that Eggers "categorically indicates that he is not currently the victim of motorcycle gangs or the Mexican mafia, and that he has not been for years. As a consequence, I find

no current evidence for the presence of delusions."

Dr. King also testified that when he asked Eggers what his view of defense counsel was, he said that they were individuals with a political agenda to get rid of the death penalty, that they didn't listen to him and didn't follow his directions, and that they didn't provide information to him when he asked for it. Dr. King stated that just because one disagrees with his attorneys does not mean that one is psychotic or delusional.

Dr. King did not agree with the results of Dr. Benedict's testing because if Eggers's "extraordinarily high" results on some scales of the MMPI-2 were valid he would "have frank and open clear delusions of persecution that would be evident to anybody." [Id. at 124.] He emphasized that an MMPI's results should always be corroborated by what is observed in a clinical interview. When Dr. King interviewed Eggers, he "saw none of that overt paranoia ... during any of the time that [he] spent with him." [*Id.* at 125.] Dr. King further added that there are no medical or correctional records supporting the kind of delusional thinking or psychotic adjustment described by Dr. Benedict in his report. He noted that ADOC records from the years 2002 through 2014 never indicated that Eggers suffered from any type of psychosis during that time or was treated for any psychosis. He added that his review of the records shows that in 2003, two different prison officials indicated that Eggers was malingering psychotic symptoms in an effort to try to get off death row and that Eggers actually admitted himself that he was malingering and reported that he was going to stop, in his words, "acting crazy." [*Id.* at 126.]

Dr. King explained that during his interview, Eggers told him that he wanted to waive his appeals because he thought it

was futile to continue with them, that he was seeking justice for himself and for the family members of the deceased, and that he felt that rationally there wasn't any reason to continue on with it. Dr. King noted that Eggers's most recent pleadings in this Court and the Alabama Supreme Court seeking to waive all appeals appeared consistent with what he had told him during his interview and that they were organized, well written, to the point, and contained no information about conspiracy theories or the like.

Dr. King's formal diagnosis of Eggers was narcissistic personality disorder, and he noted that Drs. Shealy and Hooper's diagnoses at the time of trial in 2002 were essentially the same as his. He stated that narcissistic personality disorder "would not prevent [Eggers] from making a rational decision about how to proceed forward in his case," that it "is not considered to be a serious mental illness," and that it is not a psychotic disorder or a delusional disorder. [*Id.* at 129.]

On cross examination, Dr. King acknowledged that he did not conduct any interviews of anyone other than Eggers but stated that Eggers "said he clearly has no psychological problems. He was very adamant about it." [*Id.* at 132.] When asked whether he would change his opinion that Eggers does not suffer from psychosis if he was told that Eggers was treated with Risperdal, Klonopin, Elavil, and Prozac while in prison, he stated that he would not because those medications are not used to treat psychosis. When asked, he also stated that he did not think that Eggers's predisposition or genetic history for schizophrenia, if he has one, is relevant to the issue to be decided by this Court.

### C. Eggers

During Eggers's own testimony at the hearing, he explained that if he "wouldn't have [filed the motion to withdraw his appeal] I would be stuck in an appeal with [his appointed counsel] as my representatives, which could go on for years. And the issues which I actually want resolved have never been addressed. Not by this Court." [*Id.* at 155.] But when the Court then asked him if he wanted the Court to dismiss his counsel and allow him to continue his appeal *pro se*, he denied that he wanted to do that. He then mentioned that his appointed counsel had suggested to him that he file a *pro se* motion for reconsideration of the Court's ruling pursuant to Fed. R. Civ. P. 60(b). He stated that if this Court would reopen his case and consider the arguments he advanced in a *pro se* capacity, not the arguments advanced by his appointed counsel, then he might want to continue with his case *pro se*, but "if you are not going to do that, then there is no reason for me to even proceed *pro se* on appeal because you have given me nothing to appeal except a blanket denial." [*Id.* at 156.] The Court explained to Eggers that Rule 60(b) motions are not often granted, and that if he filed a Rule 60(b) motion and the Court denied it, he would likely be subject to being executed. Eggers responded that he "absolutely" understood that. [*Id.* at 157.] The Court then asked Eggers if he understood that if he simply terminated his appeal with no Rule 60(b) motion, that he would be subject to being executed, and Eggers stated that he understood. Eggers then again expressed dissatisfaction with the Court's treatment of his *pro se* issues in its Memorandum of Opinion, (*id.* at 158 ("you used nine pages to address my 316 page brief in support"), to which the Court responded that he could appeal the Court's ruling, and appointed counsel could help him with his appeal. In response, Eggers repeated his refrain that appointed counsel has shown that they have no intent in presenting the same claims that he presented, and he emphasized that he believes that he did in

fact exhaust many of the claims in state post-conviction proceedings that were found by this Court to be unexhausted, and for the claims that he did not present in state post-conviction proceedings, he should have had more access to discovery to sufficiently plead and prove those claims. In response, the Court recommended again that Eggers allow his appointed counsel to appeal those issues.

The Court also allowed Eggers to be questioned by his appointed counsel at the hearing. When asked why he believed that his counsel was concealing evidence to protect law enforcement, he explained that he learned from talking with his daughter in June 2014 that his ex-wife had provided defense counsel with a declaration about his mental state, and when he asked for a copy of it, appointed counsel told him "they didn't have to provide me with any type of evidence whatsoever and I had no right to anything." [*Id.* at 164.] He also recounted an instance in May 2014 when he requested copies of all of the written requests that his lawyers had made to all the various law enforcement agencies for records, and counsel refused to give him any. He explained that that such concealments led him to believe that his attorneys were also concealing other evidence as the case continued.

When asked about his belief that state and federal governments concealed records at the time of his trial, his response was this:

> Yeah, I do have a belief that the state and federal government concealed records at the time of my trial. And I believe that I have already shown just cause for the production of records in accord with controlling laws of the United States Supreme Court that I am entitled to records because my claims are meritorious. And I have a presented a brief in support of post-conviction discovery which I believe Judge Coogler

has not provided a comprehensive ruling upon. And I do believe that, yes, the system is designed that way. Occasionally law enforcement will get up on the stand and they will lie. If they go hurt somebody, they will lie. Just to insure that a suspect will be found guilty.

> And yes, I do believe that judges sometimes will ignore things and not rule like they are supposed to in the interest of truth, law, and justice and conceal facts in evidence and not test the veracity of or rectitude of official misconduct. And, yes, I do believe that's being done right here, yes, in this Court.

[*Id.* at 167.] When asked if he believed that the concealment was still going on, Eggers responded:

> Yes. And my beliefs are that way because it's the basis, the basis of that is the acts and omissions of the individuals and officers of the Court. When they do something, yes, that right there is going to leave another individual to believe certain things. And yes, when you come and tell me records are no longer in existence but you refuse to provide me with something in writing which specifically states the records have been destroyed, that's still going to leave something open in my mind that the records are still in existence and, yes, you may be concealing them. . . .

> I know San Bernardino said the records existed. . . . They specifically state they have the records and that a valid court order or subpoena would need to be provided before they release the records.

[*Id.* at 168-69.]

When asked whether prison conditions and retaliation by inmates contribute to his reasons for wanting to waive his appeal, Eggers stated, "Absolutely not." [*Id.* at 182.] He then explained that the reason he wants to withdraw his appeal and be exe-

cuted is because "you guys [his attorneys] were waiving my claims and you were waiving my procedural bar exceptions which I believe I fully exhausted in state court." [*Id.* at 183.] He further explained why he disagrees with Dr. Benedict's assessment that he is not competent to make such a decision:

> Because I have full understanding of all the proceedings. I mean, I understand my claims, I understand what these proceedings are for. I understand that I was convicted of capital murder. I understand that I was sentenced to death. I understand the appellate process. I understand that I went through the state post-conviction proceedings, state post-conviction appeal. I am in federal habeas corpus. I tried to get counsel who would present my claims. You have abandoned my claims. You have presented your own claims. The Judge dismissed your claims, ignored my claims. I don't want to go on to the United States Eleventh Circuit or the United States Supreme Court.

[*Id.* at 184–85.] When asked by his counsel whether, if the Court found him competent, he would waive his appeals or attempt to appeal his *pro se* claims, he responded that he was not going to file a Rule 60(b) motion but that he thought that the Court should reconsider his case *sua sponte.*

Eggers also made it very clear that he does not believe he is delusional. The following is some of Eggers's explanation:

Q. In previous pleadings and also in other documents, you had stated that you were delusional at the time of the crime, correct, or that you had delusions?

A. Yeah. And I think that you need to look at what I said then. I was having trouble being able to identify—I was having trouble being able to identify victims or victimization conspirators.

Q. Please explain.

A. Well, me and my brother had experienced so much retaliation and intimidation from outlaw motorcycle gangs and the Mexican mafia out in California that it was just difficult to be able to discern sometimes.

Q. And so that was occurring at the time of the crime that formed the basis of this case?

A. Yeah. Even the night before the alleged offense I was experiencing that.

Q. Now, you are saying and you have said that you are no longer delusional, or that you are not delusional at this time?

A. No, I don't believe I am delusional about the things that I am talking about in relation to my case. No, I don't.

Q. Well, let me back up. Are you having any delusions now about anything?

A. No. I actually believe the things that I am telling you—and I actually can point to evidence which substantiates what I am saying.

Q. So what has changed that you were having delusions then and you are not having delusions now.

A. Well, for the most part, I stay isolated in a cell 24 hours a day seven days a week, and I have been in isolation since October of 2012.

Q. But you are receiving no medical treatment or—

A. No.

Q. —any psychological disease, correct?

A. No.

Q. And you haven't for quite some time, correct?

A. Correct.

[*Id.* at 192-94.]

### IV. Standard of Review

Whether Eggers is competent to dismiss his § 2254 habeas petition in order to be executed in this capital case is a factual question. *Lonchar v. Zant,* 978 F.2d 637, 640 (11th Cir.1992) ("Whether Larry Lonchar is competent to forgo collateral review of his conviction is a factual question.") (citing *Rumbaugh v. Procunier,* 753 F.2d 395, 398–99 (5th Cir.1985)).

### V. Discussion

#### A. The Competency Test

■ In *Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966), the United States Supreme Court established the test for determining competency to waive post-conviction review in a capital case. The test is whether the defendant "has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Id.* at 314, 86 S.Ct. at 1505. The Eleventh Circuit explained in *Lonchar* that applying the *Rees* test "involves a determination of (1) whether that person suffers from a mental disease, disorder, or defect; (2) whether a mental disease, disorder, or defect prevents that person from understanding his legal position and the options available to him; and (3) whether a mental disease, disorder, or defect prevents that person from making a rational choice among his options." 978 F.2d at 641–42 (citing *Rumbaugh,* 753 F.2d at 398).

#### B. *Lonchar's* First Prong

■ This Court's first task is to decide whether Eggers suffers from a "mental disease, disorder, or defect." In this regard, after considering all of the evidence, the Court finds Dr. King's diagnosis of a personality disorder more persuasive than Dr. Benedict's diagnosis of paranoid schizophrenia. Regardless, Eggers still satisfies the first prong of the test for incompetence under *Lonchar* because a personality disorder constitutes "a mental disease, disorder or defect" in this Circuit. *See Ford v. Haley,* 195 F.3d 603, 617 (11th Cir.1999) ("[T]he district court found that Ford suffered from depression and a personality disorder, both of which are mental disorders. Thus, the district court correctly assumed that the first prong of *Lonchar* was met.").

#### C. *Lonchar's* Second and Third Prongs

■ Next, the Court must determine whether the second or third prongs are met. Appointed counsel concedes that Eggers understands "his legal position and the options available to him," but asserts that the psychotic delusions Eggers suffers from prevent him from "making a rational choice among his options."[4] The Court disagrees.

As an initial matter, the Court is not persuaded by Dr. Benedict's opinion that Eggers suffers from psychotic delusions. Of the four mental health professionals who have formally evaluated Eggers, three (Drs. King, Shealy, and Hooper) agree that Eggers suffers from various types of personality disorders but that he does not suffer from any *severe* mental illness. Moreover, Dr. Benedict's own testimony fails to establish that Eggers suffers from

---

4. Appointed counsel cites *Rumbaugh* for the proposition that the second and third prongs of the test are framed as disjunctive alternatives, so that a petitioner need not prove both in order to meet the test of incompetency to waive post-conviction review. *See* 753 F.2d at 398–99.

any serious mental illness. As Dr. Benedict acknowledged, the DSM-V sets forth certain diagnostic criteria that must be present in order to diagnose a person with a psychotic spectrum disorder, such as paranoid schizophrenia or a delusional disorder, including hallucinations, delusions, disorganized thinking, and negative symptoms such as withdrawal. Dr. Benedict opined that the most obvious symptom of schizophrenia Eggers displays is delusional activity. However, Dr. Benedict's testimony reveals that he had an insufficient basis to support his diagnosis. As Dr. Benedict acknowledges, the DSM-V specifically defines delusions as falsely-held beliefs that persist in the presence of evidence to the contrary. Despite this, Dr. Benedict could not substantiate his opinion that Eggers's beliefs are actually delusional, i.e. that they are falsely-held and persist in the face of evidence to the contrary.

For example, Dr. Benedict cited Eggers's belief that *ex parte* communications may have occurred between this Court and the United States Supreme Court clerk's office as an example of a psychotic delusion. However, Eggers's cross examination of Dr. Benedict reveals that Eggers's belief is based not on some fantastic or impossible scenario, but rather on an inference drawn from his interpretation of the Supreme Court's filing rules. Eggers is certainly not the first criminal defendant or petitioner to allege that a court has engaged in improper *ex parte* communications. *See, e.g., Whisenhant v. Allen*, 556 F.3d 1198, 1200 (11th Cir.2009) (per curiam) (rejecting petitioner's claim that trial judge had an *ex parte* communication with the prosecution before trial).

Dr. Benedict's opinion is similarly ill-founded with respect to other alleged "delusions." For instance, he appears to believe that Eggers's reports of having been subject to ill treatment by inmates and prison personnel, such as food tampering,

threatening violence, and physical assault, is irrational. As the Court suggested during the hearing, no one has presented any evidence that this does *not* go on at prisons. Additionally, with regard to prison personnel, Eggers does not allege direct involvement by guards in tampering with his food or attacking him.

Similarly, the Court is not persuaded that Eggers's suspicions that arise out of his having been a confidential informant during his youth qualify as "delusions" under the DSM-V's definition. It appears that Eggers was indeed a confidential informant in the eighties and provided information regarding "a notorious figure in San Bernardino County known for his connection to the Monks Motorcycle Club and its criminal activities, including drug-dealing, weapons offenses, and murder." (Doc. 52, p. 8.) Thus, as Dr. Benedict acknowledged, the danger that Eggers faced as a confidential informant was not simply made up or imagined. Moreover, Eggers has subsequently denied to Dr. King that he is still being persecuted by the people that he informed against and stated to Dr. Benedict that he does not believe that his attorneys are associated with them. In any event, to the degree that Eggers may have exhibited a certain amount of paranoia or fixation on this past threat, there is no evidence to show that it has inhibited his current ability to make rational choices with regard to his legal options. Indeed, the mere presence of odd or fanciful beliefs does not warrant a finding of incompetency. As the Eleventh Circuit has explained:

In *Ford II*, we affirmed the district court's findings that petitioner was competent to dismiss his § 2254 petition, discharge his counsel, and be executed. The petitioner suffered from depression and a personality disorder, thought he was going to sit at God's left hand and be an important person, stated that he

had many wives, concubines, and children whom he had visited in various parts of the world, and that he had once "visited Heaven." 195 F.3d at 612–13. The district court, relying on the three-prong test enunciated in *Lonchar*, found Ford to be competent. The district court in *Ford II* noted that in *Lonchar*, the Eleventh Circuit had found Lonchar competent because he knew what he had been charged with, the penalty that had been given, and the ultimate outcome if the penalty was imposed on him. *See id.* at 615. Moreover, this court had acknowledged that *Lonchar* was competent because he exhibited a basic understanding of the habeas proceedings, persisted in his opposition to further review of his convictions, and stated that he understood that without further proceedings he would be executed. *See id.* Therefore, the district court in *Ford II* found that Ford, like *Lonchar*, "understood the 'bottom line' of his legal situation-that he must continue to engage in the review process or be executed-and that he was able to make a rational choice among these options." *Ford II*, 195 F.3d at 615. The district court in *Ford II* also acknowledged that Ford suffered from "significant behavioral and emotional problems," but plainly understood that "in his legal situation, he must choose either to continue his legal challenges or be executed." *Id.* Furthermore, the district court found that Ford satisfied *Lonchar*'s third prong because he had rational reasons for choosing to die: he was tired of languishing in prison; he was pessimistic he would ever get out of prison; and he truly believed he would be happier in the afterlife. *See id.* This court affirmed the district court's findings and conclusions in *Ford II*.

*Hauser ex rel. Crawford v. Moore*, 223 F.3d 1316, 1322–23 (11th Cir.2000).

The record also shows that Eggers's decision to terminate appointed counsel and waive his appeals is not the product of psychosis. Eggers explained to Dr. King that his desire to terminate counsel and waive his appeals was based on his belief that they had a political agenda to get rid of the death penalty, that they didn't listen to him, didn't follow his directions, and didn't provide him with information when he asked for it. This belief is based on the undisputed fact, as conceded by Dr. Benedict, that his counsel withheld from him a copy of his ex-wife's declaration for a period of several months. Eggers may have a highly suspicious nature, but Dr. Benedict was unable to point to anything that showed Eggers's beliefs were "falsely-held." Moreover, he believes appointed counsel should have pursued different claims than they did, but those claims are no longer available to him. Specifically, Eggers believes appointed counsel never adequately pursued his *Brady* claims regarding documents that would have been in existence at the time of trial. Consequently, Eggers feels he is "stuck in an appeal ... which could go on for years," but that would not address "the issues [he] actually wanted resolved." [Tr. at 154-55.] Finally, Eggers believes the court system has essentially failed him. He believes that courts don't always do what they should, and law enforcement will lie "just to insure that a suspect will be found guilty." [*Id.* at 167-68.] His beliefs about the court system are cynical, but they do not amount to a psychotic delusion.

Dr. Benedict's diagnosis of paranoid schizophrenia is also weakened by the fact that he does not explain how Eggers suffers from any of the other symptoms delineated in the DSM-V's definition. Dr. Benedict mentioned "brief episodes of disorganized thinking" as a symptom of Eggers's alleged schizophrenia. However, Dr. Benedict described these episodes as brief, which indicates that they would not meet the DSM-V's requirement that symptoms

be present for at least six months to support a diagnosis of psychosis. Nor did Dr. Benedict testify regarding the duration of Eggers's negative symptoms, including interpersonal withdrawal. He merely stated that Eggers has a strong preference to be in isolation and to withdraw from other people.

Dr. Benedict's testimony also presents other facts that undercut the reliability of his opinion. In his report, Dr. Benedict discounts the prior mental health evaluations of Drs. Shealy and Hooper—who each found that Eggers suffered from nothing more than a personality disorder—by stating that the passage of time has provided him with the "major advantage" of having been able to "track[ ] the course of Eggers' symptoms." However, the documentary evidence shows that Eggers never displayed clear symptoms of psychosis prior to trial. Indeed, he had never been diagnosed with any mental illness prior to his trial. While Dr. Benedict relied on a police report from 1987 describing Eggers's mental state after a methamphetamine-fueled road trip, he also conceded that Eggers's behavior at that time could have been explained by his drug use. And in the next ten or so years before the murder for which he was convicted, he had no contact with mental health authorities whatsoever. While Dr. Benedict relied heavily on reports by friends and family members who told him things like Eggers once reported "hearing voices;" he "became 'paranoid' after Federal officers had him become an informant;" he talked "about bikers and the Mexican mafia being after him;" and he seemed to have symptoms of paranoid schizophrenia like his brother; these accounts describe events that allegedly occurred years before his crime and nearly thirty years ago. The Court declines to give these non-contemporaneous accounts much weight, given that Eggers's medical records show a finding of malingering and the absence of any subse-

quent delusions or hallucinations. Indeed, Eggers's ADOC medical file notes that Eggers was malingering psychosis around the time of his trial in 2002 and 2003, that he admitted that fact, and that he decided to stop. Throughout the rest of Eggers's ADOC file there is a total absence of any indication that he was ever hallucinatory, delusional, disoriented, or suffering from any sort of mental instability. To the contrary, from 2005 to 2014, correctional records consistently describe him as alert, calm, cooperative, normal in affect and thinking, coherent, and without symptoms of anxiety, depression, mania, or psychosis. Nor has Eggers been on any medication for anxiety or depression in many years. Dr. Benedict did not address the records from this period in his report, and when asked about them, expressed that he was somewhat unfamiliar with them. Far from showing a progression of symptoms as Dr. Benedict described, these records show a complete absence of symptoms for a long period of time. And, contrary to Dr. Benedict's contention that his opinion was "corroborated" by these ADOC medical records, his report and direct testimony failed to address the fact that Eggers was malingering in the early 2000s. For all of the foregoing reasons, the Court does not deem Dr. Benedict's opinion that Eggers currently suffers from paranoid schizophrenia credible.

Instead, the evidence supports Dr. King's diagnosis, that Eggers suffers, at most, from a personality disorder and that he is able to make a rational choice among his legal options. Dr. King's opinion is supported by the results of the ECST-R that he administered, as well as his own observations of Eggers. In explaining why he didn't give more credence to the results of Dr. Benedict's testing, Dr. King explained that if Eggers's "extraordinarily high" results on some scales of the MMPI-2 were valid he would "have frank and

open clear delusions of persecution that would be evident to anybody." [Tr. at 124.] However, Dr. King found no evidence of such delusions in his evaluation of Mr. Eggers. Although the presence of a personality disorder is sufficient to meet the first *Lonchar* prong, as in *Ford*, Dr. King's opinion provides support for the conclusion that Eggers nonetheless understands his legal situation and "has the ability to make rational choices among his options and has done so." *Ford*, 195 F.3d at 617, 623.

Finally, this Court observed Eggers's behavior and demeanor at the hearing, and there was absolutely nothing about either that indicated mental incompetence or delusional thought processes. To the contrary, perhaps the most persuasive evidence that Eggers understands his legal situation is his own testimony. He made it clear that he understands his claims, what these proceedings are for, that he was convicted of capital murder, that he was sentenced to death, how the appellate process worked, how the state post-conviction proceedings operated, that he is now in federal habeas corpus proceedings, that his attorneys did not present the claims he wanted them to, and that he does not want to go on to the Eleventh Circuit Court of Appeals. [Tr. at 184-85.]

To the extent Eggers continued to assert at the hearing that this Court did not adequately address his *pro se* habeas claims, the Court notes that despite the fact that Eggers had appointed counsel, Eggers was allowed to amend their petition on his behalf to assert his own *pro se* claims. The Court also docketed and reviewed the nearly-one-hundred *pro se* pleadings that Eggers mailed to the Court, when it could have struck them from the record because Eggers was represented by counsel. Additionally, the Court dedicated the final section of its Memorandum of Opinion to addressing Eggers's *pro se* claims. (Doc. 134 at 155-

65). The issue before this Court is not whether Eggers's legal opinions as to the merits of these claims are correct or incorrect; it is whether Eggers's decision to waive his appeal is the product of his rational reasoning or a psychotic delusion. In *Ford*, although one of the experts had noted that Ford did not appear to understand each of the legal issues framed in his habeas petition or the likelihood of prevailing on any or all of them, the Eleventh Circuit held that under *Lonchar*, such an understanding was not necessary, and all a petitioner need show in order to satisfy the second prong is that "[he] exhibited a basic understanding of the habeas proceedings, persisted in his opposition to further review of his convictions, and stated he understood that without further proceedings, he would be executed." 195 F.3d at 618–19 (internal quotation marks omitted).

If there was any doubt raised from Eggers's testimony during the hearing as to whether he truly wanted to withdraw his appeal in its entirety, he dispelled it in pleadings he filed subsequently. As noted, after the hearing, when prompted by the Court to clarify whether he would like to appeal in a *pro se* capacity if allowed to do so, he filed a pleading stating in bold on the first page that he "simply withdraws and waives all future appeals in their entirety." (Doc. 161 at p. 1.) Although he continued with twelve pages of "discussion," he wrote a disclaimer of sorts on the first page: "Nothing below voids the waiver above. I have meditated about my available legal options, giving them full serious consideration." (*Id.*) Throughout the following twelve pages he explained, as he has done several times before, why he wants to waive his appeals. The following is some of his explanation:

I have often considered how, Bennie Francis Murray's son had been placed in a position to explain to his own children

"why" they do not have a grandmother, recognizing his grief and agonizing pain and suffering, which has continued now for fifteen years, passed on from generation to generation. . . .

The delays in the process are not beneficial to any party. . . .

My position shall not change until I am executed, but an appeal shall not be filed. . . .

Even if the Court granted relief [via a Rule 60(b) motion], the State would be free to appeal, again launching me into another undetermined time frame. . . .

For the sake of clarity; There will always be a desire to appeal the Court's order of dismissal of my *pro se* claims and procedural bar exceptions, but it's not feasible. . . .

Let's move forward eliminating any further undue delays in my execution providing the people with justice long overdue. Nobody else is to blame, no one should feel guilty granting my request and prayer for relief. The decision was mine alone to make. Please do not make me beg any more. I simply withdraw and waive all future appeals in their entirety.

(*Id.* at 2-5, 11.)

## VI. Conclusion

The Court finds that Eggers has made a rational choice to dismiss his appointed counsel and to abandon his appeal. Eggers has the right to make that decision, provided he is competent to do so, and the evidence indicates that he is. Accordingly, Eggers's pending motions to withdraw his appeal, dismiss appointed counsel, and proceed to execution (docs. 136 and 139) are hereby **GRANTED.**

The Clerk is **DIRECTED** to mail a copy of the foregoing to Eggers.

**DONE** AND **ORDERED** ON SEPTEMBER 21, 2016.